[Crim. No. 10819. First Dist., Div. Two. Apr. 25, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY ANDREW WALLACE, Defendant and Appellant.

## COUNSEL

Harvey E. Goldfine, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, William D. Stein and Sanford Svetcov, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROUSE, J.**—This is an appeal by defendant Henry Wallace from a judgment convicting him of second degree murder, in violation of Penal Code, section 187. Defendant's sole contention on appeal is that the court ought to have granted his motion, under Penal Code, section 1538.5, to suppress certain evidence obtained in an allegedly unlawful search of his home.

The evidence produced at the hearing on defendant's motion to suppress may be summarized as follows: Sergeant Harmon testified that at 4:15 p.m. on March 1, 1971, he was on duty in a patrol car when defendant Wallace flagged him down on the street, stating that his wife had been hurt and that he needed help badly. Harmon asked defendant where his

wife was, and defendant turned and led the officer into the open door of a house. The door led into a living room where Harmon observed a woman, subsequently identified as defendant's wife, seated on a couch. She was bleeding from the nose and mouth. Harmon asked defendant what had happened, and he stated that his wife had fallen down. Harmon then went to his patrol car and called for an ambulance.

Sergeant Harmon returned to the house after completing the call, where he then had occasion to examine Mrs. Wallace more closely in an attempt to determine how serious her condition was. In the course of so doing, he noticed a bloodstain and what appeared to be a cut on her back. Harmon asked defendant if he knew how that had happened. Defendant replied that he guessed that his wife had gone to the liquor store to cash her check and that she had probably had the money in her hand and had been "jumped."

At this point, Sergeant Harmon returned to his patrol car and called for a cover unit. Officer Burke arrived at the scene in response to the call, and he and Harmon then examined the wound on Mrs. Wallace's back more closely. Both officers concluded that it was a stab wound.

Mrs. Wallace was taken away in an ambulance within a few minutes after Sergeant Harmon had initially arrived at the scene. Defendant was crying and repeatedly asked Harmon if his wife was going to die. In response to further questioning by Harmon as to what had happened, defendant alternated between stating that his wife had fallen down and recounting the liquor store incident he had mentioned earlier.

Sergeant Harmon found no signs of blood in any area of the living room other than the area in the immediate vicinity of the couch where Mrs. Wallace had been sitting. He likewise found no traces of blood in the bedroom or bathroom areas of the house. Officer Burke also looked for blood at the entrance to the house, and he walked down the sidewalk a distance of one block in each direction. Although he examined the sidewalk, the street and the grass, he saw no sign of blood.

Sergeant Harmon asked defendant to accompany him to the police station for a further interview. Defendant was not placed under arrest or advised of his constitutional rights. He willingly agreed to go to the police station.

At approximately 4:45 p.m., just before defendant was taken to the police station, Officer Gray, a police evidence technician, arrived at the house. It was his duty to gather evidence of a possible crime. No search

warrant had been obtained, and defendant was never at any time asked to consent to a search of his house.

Officer Gray testified that he talked with Sergeant Harmon and Officer Burke and learned that Mrs. Wallace appeared to have sustained a stab wound. After defendant had been taken to the police station, Gray went into the kitchen. He testified that the door leading from the living room into the kitchen was wide open. Upon entering the kitchen, Gray saw that the stove was on and that some food was frying in a pan. He also observed a knife in the kitchen sink, but it did not appear to have any traces of blood on it. He then noticed that one of the kitchen drawers was slightly ajar. Gray was unable to see any of the contents of the drawer until he opened it. However, when he opened the drawer, he found a knife with a red substance on the blade. He took the knife into custody and also took photographs of the drawer where he found it.

It was subsequently determined that the knife bore stains of type A blood, the same blood type as the victim. Defendant had type O blood.

On this appeal defendant argues that the trial court ought to have granted his motion to suppress the knife and the photographs taken by Officer Gray because the search of the kitchen was made without a warrant and was not justified under any of the recognized exceptions to the general rule prohibiting warrantless searches. Defendant's position is untenable.

Although there would appear to be no California case directly in point, the Attorney General has cited a number of decisions from other jurisdictions upholding an immediate warrantless search of a homicide scene on the basis of exigent circumstances or general notions of reasonableness. (*Lonquest* v. *State* (Wyo. 1972) 495 P.2d 575; *Brown* v. *State* (Tex. Crim.App. 1971) 475 S.W.2d 938; *State* v. *Sample* (1971) 107 Ariz. 407 [489 P.2d 44]; *State* v. *Oakes* (1971) 129 Vt. 241 [276 A.2d 18]; *State* v. *Chapman* (Me. 1969) 250 A.2d 203; *Stevens* v. *State* (Alaska 1968) 443 P.2d 600.)

In *State* v. *Chapman, supra,* a case which is remarkably similar, on its facts, to the instant case, the officer went to the defendant's home and found his wife slumped in a chair with blood on her face, hands and clothing. Defendant volunteered that "she fell down" and that "she hemorrhaged." The defendant was taken into custody, but no charges were filed. On the following day, the police made a complete and thorough search of the entire house and basement and found the murder weapon, a whiskey bottle, concealed under paper and trash in a barrel in the garage.

The Supreme Judicial Court of Maine upheld the validity of the search and seizure, pointing out that when the police were confronted with circumstances suggestive of homicide, a duty immediately arose to make a thorough investigation to determine whether the decedent was the victim of foul play and if so, by whom and by what means. The court stated: "[W]hen the examination of the premises was resumed, it was but the continuation of a single investigation, a 'continuing series of events,' commenced with a lawful entry and pursued because of the exigency of circumstances. Although the police had from the beginning a reasonable basis for suspecting that a weapon had been used, the actual cause of death and the element of criminal conduct could not be known or rise above the level of a rational possibility until the weapon was actually found at the termination of the investigation.

"There is no more serious offense than unlawful homicide. The interest of society in securing a determination as to whether or not a human life has been taken, and if so by whom and by what method, is great indeed and may in appropriate circumstances rise above the interest of an individual in being protected from governmental intrusion upon his privacy. In our view this is such a case. We see here no more than the 'legitimate and restrained investigative conduct undertaken on the basis of ample factual justification' which is not proscribed by the Fourth Amendment. Terry v. State of Ohio, *supra* [1968] [392 U.S. 1]. The public had a right to expect and demand that the police would conduct a prompt and diligent investigation of these premises to ascertain the cause of this apparently violent death and to solve any crime committed in the course thereof." (Pp. 210-211.)

In *State* v. *Oakes, supra*,[1] the Vermont Supreme Court, in upholding a search for and seizure of the murder weapon in a homicide case, observed that "The role of the police officer carries with it the duty and responsibility to carry out such an investigation upon the discovery of what appears to be a crime. Once authorizedly on the scene, enforcement officers are under a duty to complete their investigation of the occurrence. Here, even if their original entry had been obstructed rather than solicited, the emergency

---

[1]The facts in this case again were somewhat similar to the instant case. Defendant had telephoned for help, stating, "She's here on the floor, dying." When the officers arrived at the scene, defendant told them that he had shot his wife, and the officers then went into an adjoining room where they found the murder weapon. In upholding the validity of the search, the Vermont Supreme Court stated: "The officers were confronted with the body of Mrs. Oakes and circumstances making it their duty to conduct an investigation on the premises. This, of·itself, justified the search and the taking into possession of the related instrumentalities there present" (p. 24).

situation called to their attention would have justified a warrantless entry and investigation of the scene as a part of their authorized duty. [Citations.]" (P. 25.)

In a logical approach to the problem, the Arizona Supreme Court avoided the traditional "slotting" of a warrantless search into one of the more acceptable categories by upholding the search on what would appear to be a theory of inherently reasonable investigative techniques.[2] There the court stated: "This was not a search incident to a lawful arrest, as the defendant was already under arrest and in custody. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Nor is it supported by 'exigent' circumstances or the necessity of preserving destructible evidence. But see Stevens v. State (Alaska), 443 P.2d 600 (1968). The evidence is also clear that a magistrate was available and that Chief Hill could have easily obtained a search warrant before returning to the mobile home.

"We believe that the warrantless search was nonetheless permissible and the fruits of the search admissible against the defendant. We find nothing in the Constitution or common sense which should prevent the police from making a warrantless search of the premises in which the victim is found dead and this is true even if the suspect exercised joint control of said premises along with the victim. . . .

"Reviewing the facts and circumstances in this case, 'the total atmosphere,' we are convinced that the search was reasonable within the framework of the Fourth Amendment and the historical reasons for its existence. The traditional right of citizens to be free from unreasonable searches and seizures and unreasonable and unnecessary invasions of their privacy is not violated when the premises upon which a deceased victim is found are searched without a warrant. The need for all citizens and particularly potential victims such as this to effective protection from crime, particularly while in their own home, would indicate that a warrantless search of the premises is not made unreasonable or unconstitutional by the fact that the defendant exercises joint control over the premises." (Pp. 46-47.)

■ We find the reasoning employed in the above cases to be sound and persuasive. In the case at bar, the officers entered defendant's home in response to his own request for aid. They were confronted with a potential homicide, and defendant furnished them with conflicting and improbable

---

[2] *State* v. *Sample, supra.* In this case, the defendant called for help, and when the police arrived, he stated that he had killed his wife. The wife's body was found in the bedroom and the defendant was arrested and taken from the scene. The police then returned to the defendant's home and conducted a warrantless search.

explanations of his wife's condition. Under these circumstances, both common sense and good investigative procedures dictated that the police retain possession of the premises and conduct a prompt and diligent investigation to ascertain the cause of the victim's death.

In *Johnson* v. *United States* (1948) 333 U.S. 10, 14-15 [92 L.Ed. 436, 440-441, 68 S.Ct. 367], the Supreme Court declared that "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with." We find this to be such a case and believe that it would be patently absurd to conclude otherwise.

We find that, under the circumstances here present, the conduct of the police officers was entirely reasonable and that defendant's constitutional rights were not abridged when Officer Gray searched the kitchen and took custody of the bloodstained knife. It follows, therefore, that the trial court properly denied defendant's motion to suppress.

The judgment is affirmed.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied May 25, 1973, and appellant's petition for a hearing by the Supreme Court was denied July 6, 1973.