518 P.2d 570

The STATE of Arizona, Appellee,

v.

Norman Orvel DUKE, Appellant.

No. 2601.

Supreme Court of Arizona,
In Banc.

Jan. 31, 1974.

Gary K. Nelson, Atty. Gen., Phoenix, by John S. O'Dowd, Asst. Atty. Gen., Tucson, for appellee.

Ed Bolding, Pima County Public Defender, by William H. Callaway, First Asst. Public Defender, Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a verdict and judgment of guilt to the crime of second degree murder, §§ 13–451 and 13–452 A.R. S., together with a sentence thereon of not less than ten nor more than twelve years in the Arizona State Prison.

We are called upon to answer the following questions on appeal:

1. Did the court err in denying defendant's motion for a mistrial because of the conduct of one of the jurors during the empaneling of the jury?

2. Was the warrantless search of the premises which the defendant shared with the deceased victim unreasonable and therefore unconstitutional?

3. Was it error to admit into evidence the hearsay statements of the deceased concerning her fear of the defendant?

4. Should the defendant's motions for directed verdict at the close of the State's case and at the close of all of the evidence have been granted?

5. Did the trial court err in failing to give the defendant's requested instructions relating to involuntary manslaughter?

6. Was the trial court in error in refusing to give the jury a cautionary instruction relating to the prosecutor's alleged misstatement of the law in his closing argument, or in the alternative in refusing to grant a mistrial on this issue?

The facts necessary for a determination of these matters on appeal are as follows. For several months prior to October 1971, the defendant, Norman Orvel Duke, age 59, was a patient at the Veteran's Hospital in Tucson, Arizona. The defendant stayed at the Veteran's Hospital during weekdays and on weekends would normally stay either with his sister or his former wife, Dorothy Duke, in a quonset-type house owned by Dorothy's employer, Cactus Craft. The house was at one time the office of Cactus Craft and was located next to the factory. Although divorced, the defendant had been living with Dorothy since September of 1970 and there was evidence that they intended to be remarried sometime in October or November of 1971. On Saturday, 2 October 1971, Norman, who was staying with Dorothy Duke, and Dorothy started drinking in the morning. Testimony indicated that Norman was drinking blackberry brandy and Dorothy beer and brandy. An argument followed concerning Dorothy's married daughter by a previous marriage and a car that the daughter wished to buy. Dorothy wanted to loan the daughter the money to help pay for the car, and Norman was opposed to the idea. Norman and Dorothy continued to drink and some friends came over and

then left. An argument also developed over whether Norman should return to the Veteran's Hospital as he stated he wished to do, or whether he should remain with Dorothy for the rest of the weekend.

At approximately 7:30 on the evening of 2 October 1971, Dorothy's daughter phoned the Sheriff's Department and asked them to go to her mother's residence as she was worried about her mother. The deputy testified that he went to the house at approximately 8:00 in the evening and found no disturbance or argument going on at the location and that both Norman Duke and Dorothy Duke indicated that everything was normal.

At about 10:00 that evening, the Sheriff's Department received a call from Norman Duke concerning a possible suicide. The officers arrived and found Dorothy seated in a chair with a .45 caliber single-action revolver in her right hand, her index finger between the trigger guard and the trigger of the revolver. She was pronounced dead upon arrival at Tucson Medical Center sometime after 10:00 p.m.

The defendant stated to the officer at that time and later when he testified in court, that he was lying on a couch asleep when a shot or loud noise woke him up. He tried to awaken Dorothy and when it became obvious that she would not respond, he called the police. The officers secured the premises and made a search of the house. The .45 Colt revolver contained five live rounds and one empty chamber with no spent cartridge present. A search revealed a spent cartridge in a cigar box and a spent .45 bullet on the floor. Testimony by the pathologist, the path of the bullet through the body and the chair, and testimony concerning the extent of the powder burns on Dorothy's blouse, indicated that the gun was fired at approximately a 45° angle downward, through the body of the deceased, from a distance of three to five feet. Paraffin tests on the hands of both the deceased and the defendant were negative. Defendant gave a blood sample at 2:15 in the morning of 3 October which showed a blood alcohol reading of .17 and

a blood sample of deceased also indicated a similar blood alcohol level.

Defendant was arrested and charged on an open count of murder. From a verdict and judgment of guilty to murder in the second degree and sentence thereon, the defendant appeals.

## PREJUDICE DURING THE VOIR DIRE OF THE JURY

During the voir dire of the jury, the court asked the jurors the following question:

"All right. Now, are there any jurors who have had any members of your family, close relatives, close friends, who have been the victims of murder or any type of homicide."

One of the jurors responded:

"JUROR RUELAS: Yes.

"THE COURT: Is this a relative, Miss Ruelas?

"JUROR RUELAS: No.

"THE COURT: Is it a close friend or what?

"JUROR RUELAS: Well, it was Wendy Fritz.

"THE COURT: Do you feel that that would cause you to be prejudiced in this kind of a trial, ma'am?

"JUROR RUELAS: Yes.

"THE COURT: All right, Miss Ruelas, I'll excuse you. Thank you very much."

At this point in the questioning, Miss Ruelas became emotional and began to cry.

The defendant moved for a mistrial contending then and on appeal:

" * * * When the jury panel heard and observed Miss Ruelas concerning her friendship with Wendy Fritz the whole specter of the Charles Schmidt (sic) murder trial must have appeared before the jury. The Schmidt (sic) murder trial was one of the most publicized trials in the history of Arizona jurisprudence and when Miss Ruelas broke down in front of the panel a mistrial should have been granted as defense counsel urged. No evidence had yet been received in the trial as the case was still in the voir dire stage. The trial Court's denial of defense counsel's motion to grant a mistrial and dismiss the panel allowed undue prejudice to come before the jury panel and made it impossible to choose a fair and impartial jury from the panel.

"It is therefore evident that the defendant was denied his Sixth Amendment right to have a fair and impartial jury decide the case and he was also therefore denied due process of law guaranteed by the Fourteenth Amendment to the United States Constitution."

We disagree.

Appellee points out, correctly we think, that defendant's motion for mistrial was actually a challenge for cause to the entire panel. The Arizona Court of Appeals has stated:

"In a court of law, where we are dealing with a multitude of human factors, perfection is unattainable and neither the defendant nor the State is entitled to a perfect trial. Insofar as possible, however, both the State and the defendant are entitled to a fair and impartial jury. When events occur that cast an irrevocable cloud over the jury's fairness and impartiality, it is far better to grant the motion for mistrial and start over again. This action should not be taken lightly, but when the interest of justice so demands, it should nevertheless be done." State v. Reynolds, 11 Ariz.App. 532, 535, 466 P.2d 405, 408 (1970).

We do not find that the interest of justice demands such action in the instant case. The challenge to the jury panel did not show that any other juror, let alone the entire jury panel, was prejudiced by the actions of this one juror. Absent a clear showing of abuse of the trial court's wide discretion in the selection of the jury, we will not set aside a ruling upon a challenge to the jury. State v. Narten, 99 Ariz. 116, 407 P.2d 81 (1965). We find no error.

## WARRANTLESS SEARCH OF THE PREMISES

After the body of the deceased was taken away, the police, without permission and without warrant, proceeded to search the premises.

Although there is a question whether or not the premises on which the body was found was, in fact, defendant's home as well as the home of the deceased, assuming, arguendo, that the defendant exercised some control over the premises, we do not believe this was an unreasonable search and seizure. In a previous opinion of this court we stated:

"* * * The traditional right of citizens to be free from unreasonable searches and seizures and unreasonable and unnecessary invasions of their privacy is not violated when the premises upon which a deceased victim is found are searched without a warrant. The need for all citizens and particularly potential victims such as this to effective protection from crime, particularly while in their own home, would indicate that a warrantless search of the premises is not made unreasonable or unconstitutional by the fact that the defendant exercises joint control over the premises. * * *" State v. Sample, 107 Ariz. 407, 410, 489 P.2d 44, 47 (1971).

■ Our holding in Sample, supra, concerning the warrantless search of the scene of the crime has been disapproved by the Ninth Circuit Court of Appeals, see Sample v. Eyman, 469 F.2d 819 (9th Cir.1972). We believe, however, that this case is distinguishable from Sample and the language quoted above is still applicable. In Sample, supra, the search occurred two hours or more after the officers first discovered the body of the deceased and had moved it from the premises, and after the officers had left the scene and then returned. In the instant case, the officers at the scene of the crime proceeded to make a search of the area, relying at first on the representations of the defendant that the deceased had committed suicide. Under these circumstances, a contemporaneous warrantless search of the scene of a crime at the time of the discovery of the body was, we believe, reasonable, and not made unreasonable and unconstitutional by the fact that the defendant may have shared possession of the premises with the deceased victim.

## HEARSAY STATEMENT OF THE VICTIM

The victim's daughter testified over the objection of the defendant's attorney that her mother had told her on the day that she died, that the defendant had threatened her the night before with a gun. The daughter testified:

"Q All right. And would you please tell the jury what your mother said to you at that time?

"A She told me that afternoon that the night before Duke had been drinking and that he had threatened her Friday night with a gun. He was holding a gun at her head and was threatening her. He told her he would kill her."

We have previously stated:

"A bald expression of fear by a murder victim standing alone does not have sufficient reliability to be admitted. In fact, if the victim were alive to testify, a foundation would be required before her expressions of fear would be admissible. There is considerable testimony in the record here to show that the victim had a valid basis for fearing her husband. Domestic problems, the filing of a divorce action, the necessity for a restraining order, the removal of the victim to a hotel until the husband vacated the house, and the threats to kill voiced by the defendant husband in the presence of others, all accord a special reliability.

"Let us meet the problem head-on, brush aside the sophistry, and say that expressions of fear by a murder victim, though they may be hearsay, are relevant, have probative value on the issue of identity, and, when in human experience they have sufficient reliability, they should be

admitted in evidence." State v. Gause, 107 Ariz. 491, 495, 489 P.2d 830, 834 (1971).

█ In the instant case, we believe that the testimony of the daughter and the surrounding facts made the statement by the decedent sufficiently reliable for its admission. The defendant, by statements before the trial and by testimony at the trial, was interposing a defense of suicide. The defendant testified that the deceased indicated that she would commit suicide if he ever tried to leave her. The expression of fear by Dorothy indicated Dorothy's state of mind and contradicted the defense of suicide raised by the defendant.

## DIRECTED VERDICT

█ At the close of the State's case and again at the close of all of the evidence, the defendant moved for a directed verdict of acquittal as to first degree murder only, it being the contention of the defendant that the State had failed to show a wilful, deliberate, or premeditated killing. Viewed in a light most strongly in favor of upholding the decision of the trial court and the verdict of the jury, State v. Manis, 95 Ariz. 27, 386 P.2d 77 (1963), we disagree.

█ To be entitled to an instruction for first degree murder, the State must show, in addition to evidence of an unlawful killing with malice, evidence that the killing was wilful, deliberate and premeditated. State v. McIntyre, 106 Ariz. 439, 477 P.2d 529 (1970). In the instant case, the evidence amply supports the finding of an unlawful killing, and use of a deadly weapon such as a gun, standing alone, is sufficient evidence from which the jury may find malice. State v. Intogna, 101 Ariz. 275, 419 P.2d 59 (1966).

█ Premeditation need not be prolonged:

" ' * * * [t]here need, however, be no appreciable space of time between the intention to kill unlawfully and the act of killing. They may be as instantaneous as the consecutive thoughts of the human mind.' " State v. Eisenstein, 72 Ariz. 320, 333, 235 P.2d 1011, 1020 (1951).

█ The fact that there was no evidence of a fight or physical altercation prior to the shooting, the fact that the deceased was seated in a chair when the bullet was fired from three to five feet away, as well as defendant's conduct thereafter including the removal of the spent cartridge from the gun, is sufficient circumstantial evidence from which the jury could find that the shooting was deliberate and premeditated, and we do not find any abuse of the trial court's discretion in instructing on first degree murder.

## REFUSAL TO INSTRUCT ON INVOLUNTARY MANSLAUGHTER

Defendant contends that the failure of the trial court to give an instruction on involuntary manslaughter was reversible error, although an instruction was given on voluntary manslaughter.

█ Defendant claimed that the deceased committed suicide and presented no evidence that would indicate any degree of homicide. The evidence as a whole supported instructions for murder and voluntary manslaughter, but there was no evidence of any unintentional act which would support an instruction for involuntary manslaughter. There being no such evidence, it was not error to refuse to give such instruction. State v. Young, 109 Ariz. 221, 508 P.2d 51 (1973).

## CLOSING ARGUMENT OF THE PROSECUTOR

The defendant in his brief states:

"The prosecutor in his closing argument to the jury made the statement that under the facts of the case, the crime that was involved could not be manslaughter because there was no evidence of provocation on the part of the victim and without provocation there cannot be manslaughter.

"That statement is an incorrect statement of the law where there is evidence of the defendant's intoxication in evidence. State v. Contreras, 107 Ariz. 68, 481 P.2d 861 (1971); State v. Hudson, 85 Ariz. 77, 331 P.2d 1092 (1958); State v. Saunders, 102 Ariz. 565, 435 P.2d 39 (1967).

"At the close of the prosecutor's argument, defense counsel requested the Court to give the jury a cautionary instruction that the prosecutor's argument concerning provocation was not the law where there was evidence of intoxication. The Trial Court refused to give the jury such a cautionary instruction or, in the alternative, to grant a mistrial. The practical effect of the Court's refusal to give the jury a cautionary instruction at the close of the prosecutor's closing argument was to have the jury labor under the erroneous belief that unless they found provocation on the part of the victim, they could not return a verdict of manslaughter."

We do not believe the jury was misled. The jury was properly instructed as to the effect of voluntary intoxication and while we agree that prior decisions of this court, State v. Contreras, 107 Ariz. 68, 481 P.2d 861 (1971); State v. Hudson, 85 Ariz. 77, 331 P.2d 1092 (1958); State v. Saunders, 102 Ariz. 565, 435 P.2d 39 (1967), have indicated that voluntary intoxication may produce a state of mind which incapacitates an accused from forming or entering the malicious intent or malice aforethought which is essential as an element of murder, State v. Coward, 108 Ariz. 270, 496 P.2d 131 (1972), that is a question for the jury. Finding that intoxication had not negated the malice, the jury could consider the question of whether there was provocation to negate malice which is the difference between manslaughter and murder. State v. Sellers, 106 Ariz. 315, 475 P.2d 722 (1970); State v. Maloney, 101 Ariz. 111, 416 P.2d 544 (1966); §§ 13–451, 13–455 A.R.S.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.