566 P.2d 273

**STATE of Arizona, Appellee,**

v.

**Rufus Junior MINCEY, Appellant.**

No. 3283.

Supreme Court of Arizona,
In Banc.

May 11, 1977.

474

Bruce E. Babbitt, Atty. Gen., Phoenix, Heather A. Sigworth, Asst. Atty. Gen., Tucson, for appellee.

Rabinovitz, Minker & Dix, P. C., by Albert Perry Dover, Bolding, Oseran & Zavala by Richard S. Oseran, Tucson, for appellant.

GORDON, Justice:

Appellant, Rufus Mincey, was convicted in a jury trial of murder, first degree, in violation of A.R.S. §§ 13–451, 13–452 and 13–453, assault with a deadly weapon in violation of A.R.S. § 13–249 B, unlawful sale of narcotics in violation of A.R.S. § 36–1002.02, unlawful possession of narcotic drug for sale in violation of A.R.S. § 36–1002.01, and unlawful possession of narcotic drug in violation of A.R.S. § 36–1002. He was sentenced to serve a term of life without possibility of parole until twenty-five years are served for Count I; to serve not less than ten nor more than fifteen years for Count II, to run concurrently with the life sentence; to serve not less than five years nor more than fifteen years for Count III, to run consecutively to the life sentence; to serve not less than five years nor more than six years for Count IV, to run concurrently with Count III; to serve not less than two years nor more than three years for Count V to run concurrently with Count III. We have jurisdiction to review this judgment under A.R.S. § 13–1711. The judgment of the trial court is reversed and remanded as to Counts I and II; judgment is affirmed as to Counts III, IV and V but remanded for resentencing.

This appeal arose out of a tragic incident in Tucson, Arizona on October 28, 1974. It began with a planned "buy-bust" by the Metropolitan Area Narcotics Squad, based originally on information from an informant. Although the testimony conflicts in some areas, on appeal we view the evidence in the light most favorable to upholding the verdict. The facts for the purpose of this appeal are as follows:

Sometime around 2 p. m. on October 28, 1974 undercover agent Barry Headricks of the Metropolitan Area Narcotics Squad went to the apartment leased by appellant. Accompanying Headricks was Charles Ferguson, the victim in the assault with a deadly weapon charge. Headricks, according to testimony, looked like a typical undercover narcotics officer: mustache and longish hair, cowboy boots, levis and a levi jacket. He also had an electronic monitoring device so that the other agents could overhear what went on.

After Headricks and Ferguson were admitted, a deal was made for the sale of a specified amount of narcotics and both appellant and Ferguson were charged with this sale. While in the apartment Headricks saw a gun in the possession of another man (probably Ferguson) in appellant's apartment. (Also in the apartment was appellant's girlfriend. When the agents returned later there were two more people in the apartment.) Headricks then left the apartment with the purported purpose of returning with the money to pay for the drugs. Actually Headricks met a fellow agent and they and eight other officers prepared to carry out the prearranged plan to consummate the "buy-bust".[1]

Headricks and another agent (Schwartz), purportedly his "money man", went up to

---

1. A "buy-bust" occurs when the undercover agent or agents make contact with a person who allegedly has illegal drugs for sale and make an offer to buy. If the agent sees the drugs or has enough information to be sure that the person does have the drugs, then an arrest is made. Commonly, as here, the plan is for the agent to leave momentarily and then a number of agents will come back to make the arrests. The usual plan is for the original undercover agent to get the door opened using his undercover identity and then the rest of the agents rush in.

the door of the apartment with drawn guns hidden behind their backs. Eight other agents and a deputy county attorney were to be waiting with drawn guns out of sight of the doorway; in fact John Hodgman, who opened the door, apparently saw the other agents and tried to close the door. Headricks knocked on the door and when the door opened he announced that it was the police, according to one officer's testimony. Hodgman tried to close the door as Headricks slipped into the apartment. Agent Schwartz prevented the door from closing and he and other agents forced entry. As the door was forced back, Hodgman was pushed partly through the wall behind the door. Schwartz and at least one other agent held Hodgman to the ground and handcuffed him. Schwartz pointed his gun at a woman who was in the room and told her "police, freeze". Moments later another agent pointed his gun at her and, in more obscene terms, told her to freeze or he'd blow her head off. At some time during these occurrences, a number of shots in rapid succession could be heard coming from the bedroom at the back of the apartment which Headricks had entered. It was later shown that both men emptied their guns shooting at each other. (One bullet, later shown to be from appellant's gun, came through the wall and grazed Ferguson's head where he was being held at gunpoint against the wall by another agent. Both men went down to the floor. This incident was the basis of the assault with a deadly weapon charge.) Shortly after the shooting stopped, Headricks came out of the bedroom, said something like "he's down," and fell to the ground. Some agents ran to Headricks to give aid and someone called for emergency assistance. Meanwhile Agent Fuller went to the bedroom door and yelled "police officer, freeze" or "come out" or something of that nature. Fuller testified that he saw a movement on the other side of the bed and then nothing more. Fuller and another agent entered the room, proceeding along the side walls. Fuller saw a woman lying on a closet floor and asked her is she was all right. When she said no he told her to stay there and

help would come soon. Fuller then crawled across the bed and found appellant lying on his back on the far side of the bed, with no visible wounds and with an automatic pistol under his hand. Appellant failed to respond to speech or to being prodded with Fuller's pistol. When the agents tried to move Mincey they saw blood underneath him and so they left him there until the ambulance came.

No weapons other than the pistol found near appellant's hand were found on any of the suspects. That weapon, a Llama .380 semi-automatic, was found to be empty when one of the agents examined it. Three other weapons were found in the living room during a subsequent search. Headricks' police special .38 revolver was also empty and was later shown to be the weapon which made those bullet holes not shown to have been caused by appellant's gun. When Headricks was taken out on a stretcher, a small semi-automatic pistol was found on the floor under where his body had been. Testimony at trial speculated that he had been carrying this second pistol in his belt at his back as is a common practice among undercover narcotics agents. The presence of the fourth pistol was not explained at trial, but it apparently had not been recently fired.

After the shootings, the narcotics agents did no investigating but waited for a special investigative team in accordance with Tucson Police Department procedure. The investigating officers searched the premises and examined the scene over a period of four days. No search warrant was obtained and no reason appears for not seeking one. Although no witness was absolutely sure, the officers apparently learned of Headricks' death after the search of the scene began.

Three or four hours after appellant arrived at the hospital emergency room, Officer Hunt interrogated him in the intensive care unit. Appellant was being fed intravenously, had a tube down his throat giving him oxygen to help him breathe, a tube in his nose down into his stomach to keep him from vomiting, and a catheter tube to his

bladder. A nurse in the intensive care unit allowed the police officer to question appellant although appellant was unable to talk and had to answer by writing notes. Some of these answers were used in an attempt to impeach appellant by prior inconsistent statements at trial. Appellant was in pain but there is no evidence that he was sufficiently under the influence of medication to render his statements involuntary and inadmissible.

The interrogation began with questions concerning another wounded suspect. Then appellant learned he was charged with killing a police officer and was given his *Miranda* rights. The trial court granted appellant's motion to suppress this interview as to its use in the prosecution's case in chief but allowed its use for impeachment purposes. The interrogation lasted about one hour but the officer twice stopped the questioning when appellant either fell asleep or lapsed into unconsciousness.

On November 1, 1974 appellant was charged in a five-count indictment and on June 12, 1975 a jury returned guilty verdicts on all five counts. Appellant's motions for acquittal notwithstanding the verdict and for a new trial were denied and sentence was imposed on July 15, 1975. Thereafter appellant filed a timely notice of appeal to this Court.

Appellant raises a number of issues which we have rearranged and reworded so as to deal with them more concisely:

1. Did the jury instructions present an incorrect *mens rea* requirement for murder "committed in avoiding or preventing lawful arrest" (A.R.S. § 13–452), thereby compelling reversal?

2. Was it reversible error to permit the state to impeach appellant with statements made by him while he was in the hospital intensive care unit?

3. Was it reversible error to admit evidence that appellant had falsified information on the federal firearms form for appellant's pistol?

4. Was it reversible error to admit statements made by appellant two and one-half months before the incident?

5. Was it reversible error to deny defendant's motion to suppress on the basis of an illegal entry in violation of A.R.S. § 13–1411?

6. Was it reversible error to deny appellant's motion to suppress on the basis of an illegal warrantless search?

7. Was it reversible error to deny appellant's motion to sever the murder count from the other counts in the indictment?

8. Was the prosecutor's conduct in closing argument so inflammatory as to deny appellant a fair trial?

### Mens Rea for the Murder Charge

Appellant was charged with murder "which is committed in avoiding or preventing lawful arrest", A.R.S. § 13–452. He alleges error in terms of the propriety of certain jury instructions but the underlying issue concerns the *mens rea* required for this kind of murder. This is an issue of first impression before our Court.

One challenged instruction reads:

"If a person has knowledge, *or by the exercise of reasonable care should have knowledge,* that he is being arrested by a peace officer, it is the duty of such a person to refrain from using force (or any weapon) to resist such arrest.

"However, if you find that the peace officer used excessive force in making the arrest, it is not the duty of such person to refrain from using reasonable force to defend himself against the use of such excessive force." (Emphasis added.)

The other challenged instruction reads:

"A person who knows *or has reason to know* that he is being illegally arrested may use such force, short of taking life, as is necessary to regain his liberty. A person resisting an illegal arrest may use only that force reasonably necessary to effect that purpose.

"A person who knows *or has reason to know* that he is being lawfully arrested has a duty to refrain from using any force to resist arrest." (Emphasis added.)

■ We agree that these instructions do not present the proper *mens rea* or scienter requirement for this kind of first degree murder. The provision of A.R.S. § 13–452 under which appellant was charged does not expressly provide a scienter requirement. The rule, barring a few exceptions, is that wrongful intent or *mens rea* is required before there can be criminal punishment. *State v. Cutshaw*, 7 Ariz.App. 210, 437 P.2d 962 (1968); *Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). The exceptions occur only when the legislative power has expressly so determined, as where criminal negligence takes the place of the intent requirement. *State v. Chalmers*, 100 Ariz. 70, 411 P.2d 448 (1966). Where the penal statute fails to expressly state the necessary element of scienter, this Court may infer the scienter requirement from the words of the statute plus legislative intent. *State v. Berry*, 101 Ariz. 310, 419 P.2d 337 (1966).

■ We hold that the scienter requirement for first degree murder "which is committed in avoiding or preventing lawful arrest," A.R.S. § 13–452, is knowledge that the victim was a law enforcement officer. That is, a defendant is guilty under § 13–452 if the murder is committed while *knowingly* avoiding or preventing a lawful arrest. This holding is based on the words of the statute and the legislative intent.

The words of this provision are similar to A.R.S. § 13–541 A, Resisting, delaying, coercing or obstructing public officer. This statute uses both the terms "wilfully" and "knowingly" in various provisions. We agree with the Court of Appeals that § 13–541 requires knowledge on the part of the defendant that the other person is a public officer. *State v. Tages*, 10 Ariz.App. 127, 457 P.2d 289 (1969). It is logical to assume the Legislature intended a similar knowledge requirement in § 13–452.

Even more persuasive is the fact that we are dealing with a first degree murder statute which carries the most drastic penalty in our system of criminal justice—death. Such a penalty has traditionally required criminal intent as the *mens rea*, and a lesser mental state such as criminal negligence is covered in a manslaughter statute. *E. g.*, A.R.S. § 13–456. Our statute defining first degree murder, A.R.S. § 13–452, was amended in 1973 to add the avoiding or preventing lawful arrest provision. Preceding this provision is the provision for wilful, deliberate or premeditated killing and following it is the felony murder provision. The first provision by its terms requires scienter, and the felony murder provision requires an intent to commit the underlying felony. *State v. Akins*, 94 Ariz. 263, 383 P.2d 180 (1963).

In this context the Legislature would not have intended the death penalty for a negligent killing nor would they have intended strict liability for killing a police officer even where the facts otherwise objectively show justifiable homicide. A knowledge requirement for first degree murder committed in avoiding or preventing a lawful arrest is mandated.

■ In fact, the jury was given a proper instruction because the trial court modified the state's requested jury instruction by adding the word "knowingly:"

"A murder which is perpetrated by lying in wait or by any other kind of wilful, deliberate and premeditated killing, or which is perpetrated in *knowingly* avoiding a lawful arrest is murder in the first degree." (Emphasis added.)

So the issue is analogous to our recent decision in *State v. Rodriguez*, 114 Ariz. 331, 560 P.2d 1238 (1977): conflicting jury instructions were given concerning the intent or *mens rea* necessary for conviction.

In *Rodriguez* we concluded under the facts of that case that the incorrect instruction was not so prejudicial as to require reversal. Two crucial facts in this determination were that other than the reading of the instructions, the incorrect instruction was never mentioned to the jury and that the correct intent requirement was "brought home forcefully to the jury in closing arguments no less than six times." *State v. Rodriguez*, 114 Ariz. at 334, 560 P.2d at 1241.

The situation was exactly the opposite at appellant's trial. In closing argument the prosecutor emphasized the incorrect instruction, discussing it at least twelve times. The case went to the jury on an alternative theory of negligence ("knew or by exercise of reasonable care should have known"). Under these circumstances we have no way of knowing on what basis the jury determined appellant's guilt. Conviction under the avoiding arrest section of A.R.S. § 13–452 requires that the jury find the defendant acted knowingly. The jury here could have rendered a guilty verdict on the basis of negligence rather than knowledge.

For the foregoing reasons, we find the giving of the challenged instructions was prejudicial and reversible error. Accordingly, the judgment of the trial court as to Count I (murder, first degree) is reversed. Because the conviction on Count II (assault with a deadly weapon) may involve the same issues discussed *supra,* the judgment as to Count II is also reversed.

### Statements in Intensive Care Unit

Under the circumstances described, *supra,* appellant was interrogated while in the Intensive Care Unit of the University of Arizona Hospital. *Miranda*[2] warnings were given, but after each indication from appellant that he wanted to consult an attorney or that he wanted to stop answering questions, the police officer continued to question appellant.

■ The United States Supreme Court held in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) that police must cease questioning when the suspect indicates he wishes to assert his right to remain silent or his right to an attorney. This mandate was recently affirmed in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) and *Oregon v. Haas,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); cf. *Brewer v. Williams,* —— U.S. ——, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Statements made in violation of

this rule are not admissible in the prosecution's case in chief but may be used for impeachment purposes (if the defendant takes the stand at trial) so long as traditional standards of voluntariness and trustworthiness are met. *Oregon v. Haas, supra; Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

Prior to trial appellant made a motion to suppress the statements he made while being interrogated at the hospital, arguing their inadmissibility for all purposes because of violations of the requirement of *Miranda* and because of lack of voluntariness. A hearing was held as required by *State v. Owen,* 96 Ariz. 274, 394 P.2d 206 (1964), and testimony and oral argument were heard by the trial court. The court granted appellant's motion as to use of the statements in the prosecution's case in chief but denied the motion as to use for impeachment purposes.

■ The court did not make a specific finding as to the voluntariness of the statements. In 1964 the United States Supreme Court held that before a confession can be admitted into evidence, the trial judge must hold a hearing outside the presence of the jury and make a clear finding of voluntariness. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Since then this Court has consistently held that failure to make a definite ruling on voluntariness before admission requires either a remand for the trial court to make such a finding or reversal unless the admission of the evidence itself was harmless error. *State v. Marovich,* 109 Ariz. 45, 504 P.2d 1268 (1973). This rule applies here because for the purposes of compliance with *Jackson v. Denno, supra,* there is no difference between confessions and admissions. *State v. Owen, supra.*

■ We stated in *Marovich, supra,* in dictum that denial of a motion to suppress could be tantamount to a finding of voluntariness where it is clear the trial court understood *Jackson v. Denno* and merely worded the ruling badly. We believe such a

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

situation occurred here. Under the circumstances of this case, it is clear that a finding of voluntariness underlies the trial court's ruling and therefore the lack of such a specific finding is not reversible error.

In this case the prosecutor told the trial court that he did not intend to use these statements in his case in chief, and so his only argument at the hearing was that the statements were voluntary and admissible for impeachment purposes. The United States Supreme Court rule described *supra* is that to be admitted for impeachment purposes statements which violated *Miranda* must pass traditional voluntariness and trustworthiness standards. In the context of this case, the trial court's decision to exclude the statements in question for purposes of the prosecution's case in chief but to admit them for impeachment purposes can be based only on an underlying decision that the statements violate *Miranda* but do not offend traditional standards of voluntariness. We hold the failure to make specific findings, although error, is not reversible error under the specific circumstances of this case.

 In addition to the problem of the lack of a specific finding of voluntariness appellant urges this Court to find reversible error because the statements were not in fact voluntary. It is well settled that the trial court's determination of the admissibility of a defendant's statement will not be overturned unless clear and manifest error appears. *E. g. State v. Edwards*, 111 Ariz. 357, 529 P.2d 1174 (1975). We look to the totality of the circumstances to decide if the statements were properly admitted. *State v. Miller*, 110 Ariz. 597, 522 P.2d 23, *cert. denied*, 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 281 (1974). The evidence in this case is sufficient to support the determination of the trial court.

There was testimony that the nurse in the intensive care unit gave the police officer permission to interrogate appellant and that she was present during the interrogation. She testified that she had not given appellant any medication and that appellant was alert and able to understand the officer's questions. She also testified that neither mental or physical force nor abuse was used on appellant. She said that appellant was in moderate pain but was very cooperative with everyone. The interrogating officer also testified that appellant did not appear to be under the influence of drugs and that appellant's answers were generally responsive to the questions.[3] The officer testified that he used no force or coercion, neither mental or physical. Nor were any promises made. On the basis of this testimony the admission of the statements for impeachment purposes was not an abuse of discretion.

 Appellant also makes some arguments concerning whether the impeaching statements are sharply contradictory to his testimony. These arguments go to the weight and not the admissibility of the evidence.

For the foregoing reasons we uphold the trial court's determination of the admissibility for impeachment purposes of appellant's statements made while in the hospital.

*Admission of Federal Firearms Form*

 Appellant argues that admission of the federal firearms form on which he falsely denied he was a heroin addict is improper and inadmissible impeachment by prior misconduct and is irrelevant as well. Appellant admits in his brief, however, that it would be admissible to show intent, citing *State v. Schmid*, 107 Ariz. 191, 484 P.2d 187 (1971). It would also be admissible, of course, to impeach appellant by a prior inconsistent statement. Both of these bases for admission apply here and the evidence is, therefore, relevant also.

One aspect of the prosecution's case was to attempt to show that appellant had been planning to shoot any police officer who might "hassle" him, thereby negating appellant's self-defense claim. Appellant testified that he thought he had purchased the

---

**3.** We might add at this point the fact that appellant was able to write his answers in a legible and fairly sensible fashion provides further support for the trial court's determination.

pistol used in the shooting some three or four weeks prior to the time he had actually purchased it. The implication of that part of his testimony was that the gun had been purchased with no specific purpose. The firearm form was introduced to show that it had been purchased very shortly before the shooting. Cross-examination of appellant also brought out the fact that appellant felt he would be unable to purchase a gun legally unless he lied about being a heroin addict. It is clear that admission of the firearms form is relevant both to the intent issue and to contradict appellant as to date of purchase, and it was admitted for these purposes.

Appellant also argues that even if this evidence is admissible, it is so highly prejudicial that its admission is reversible error. *State v. Little*, 87 Ariz. 295, 350 P.2d 756 (1960). The evidence here, however, is not highly prejudicial. The jury already knew that appellant was a heroin addict because of his testimony. Evidence of falsification of a federal firearms form is not sufficiently prejudicial to render inadmissible evidence admissible on two other valid grounds. The admission of this evidence was proper.

### Statements Made Two and One Half Months Earlier

Appellant challenges the admission of a witness' testimony concerning a conversation which occurred two and one half months prior to the shooting. The witness testified that appellant said he planned to buy a sawed-off shotgun in case anyone hassled him or in case the pigs hassled him. Appellant, citing Wigmore on Evidence, §§ 394–396, argues that this statement concerning his mental state is inadmissible because (1) it is not a threat against a specific class, (2) there is no showing of a continuing mental state until the time of the shooting, and (3) the shooting incident was not a manifestation of the statement.

The statement in question can reasonably be interpreted as a threat against a specific class: police. Appellant does not argue there is any ambiguity in the meaning of the term "pigs". That people in general were also included does not take away from the specificity of "pigs".

It is well settled that remoteness in time does not control admissibility of such evidence but rather is a factor to be considered by the jury in determining the weight of the evidence. *Sparks v. State*, 19 Ariz. 455, 171 P. 1182 (1918); *State v. Moore*, 111 Ariz. 355, 529 P.2d 1172 (1974). It is impossible to set definitive guidelines as to the time limits for evidence of a continuing state of mind. In *State v. Moore, supra*, we upheld admission of two statements made eighteen months and one year prior to the incident at issue. The time period here is, of course, much less remote and admission of the statement was proper. It is within the jury's province to determine the weight of such evidence.

Similarly, so long as it is a reasonable inference, it is within the jury's province to decide if the shooting incident is a manifestation of the earlier statement. In this case one reasonable inference from the evidence is that the shooting was a manifestation of appellant's earlier statement. The fact that belief in appellant's defense theory would lead one to the opposite inference does not create reversible error or, indeed, any error at all.

Appellant raises some other points but they all go to the weight of the evidence and that is not an issue on appeal. We hold the admission of the prior statement proper.

### A.R.S. § 13–1411

Appellant argues that the arrest was illegal due to noncompliance with A.R.S. § 13–1411 and therefore his motion to suppress all evidence should have been granted. A.R.S. § 13–1411 provides:

"§ 13–1411. Right of officer to break into building

"An officer, in order to make an arrest either by virtue of a warrant, or when authorized to make such arrest for a felony without a warrant, as provided in § 13–1403, may break open a door or window of any building in which the per-

son to be arrested is or is reasonably believed to be, if the officer is refused admittance after he has announced his authority and purpose."

There was sufficient evidence for the trial court to find that A.R.S. § 13–1411 had been complied with. One officer testified that he heard Officer Headricks say police or something like that when the door was first opened. There was also testimony that at least one other officer announced his authority during the time the officers were trying to push open the door after it had been almost shut. Under all the circumstances of this case there can be no doubt that the person answering the door, when told it was the police, also knew their purpose. If one is in the midst of a drug buy, when the buyer announces that he is a police officer, his purpose is hard to misconstrue.

Appellant also discusses Headricks' entry into appellant's bedroom. That entry is relevant to the self-defense issue but not to A.R.S. § 13–1411 which deals only with breaking into a building not with actions after entry.

We uphold the trial court's denial of the motion to suppress regarding A.R.S. § 13–1411.

### Warrantless Search

Appellant argues that the warrantless search of his apartment was illegal in violation of the Fourth Amendment of the United States Constitution. He alleges—correctly—that there were not sufficient facts to fit within the usual "exigent circumstances" exception and that there was ample time to secure a warrant. Thus the issue is whether this Court will adhere to its previous rulings which hold the search of a murder scene under certain circumstances

to be a valid exception to the constitutional warrant requirement. *State v. Sample*, 107 Ariz. 407, 489 P.2d 44 (1971);[4] *State v. Superior Court*, 110 Ariz. 281, 517 P.2d 1277 (1974); *State v. Duke*, 110 Ariz. 320, 518 P.2d 570 (1974).

After reviewing this issue we are reaffirming our rule. We will set some guidelines, however, because we support the principle that "[s]earches conducted without a warrant issued upon probable cause are 'per se unreasonable * * * subject only to a few specifically established and well-delineated exceptions.' *Schneckloth v. Bustamonte*, 412 U.S. 218 at 219, 93 S.Ct. 2041, at 2043, 36 L.Ed.2d 854, at 858 (1973)." *State v. Sardo*, 112 Ariz. 509, 543 P.2d 1138 (1975). With the guidelines, *infra*, in this opinion, search of a murder scene is such a "specifically established and well-delineated exception."

We hold a reasonable, warrantless search of the scene of a homicide—or of a serious personal injury with likelihood of death where there is reason to suspect foul play—does not violate the Fourth Amendment to the United States Constitution where the law enforcement officers were legally on the premises in the first instance. We chose not to limit this warrant requirement exception only to actual murders because immediate action may be important to determining the circumstances of death and because a reasonable search should not later be invalidated because the intended murder victim may be saved by a medical miracle. For the search to be reasonable, the purpose must be limited to determining the circumstances of death and the scope must not exceed that purpose. The search must also begin within a reasonable period following the time when the officials first learn of the murder (or potential murder). Cf. *State v. Duke, supra.*

---

**4.** The United States Court of Appeals for the Ninth Circuit disagreed, *Sample v. Eyeman*, 469 F.2d 819 (9th Cir. 1972). There are, however, a number of other jurisdictions with some sort of murder scene exception: e. g., *Stevens v. State*, 443 P.2d 600 (Alaska 1968), *cert. denied*, 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969); *People v. Wallace*, 31 Cal.App.3d 865, 107 Cal.Rptr. 659 (1973); *Patrick v. State*, 227 A.2d 486 (Del.1967); *State v. Chapman*, 250 A.2d 203 (Me.1969); *State v. Oakes*, 129 Vt. 241, 276 A.2d 18, *cert. denied*, 404 U.S. 965, 92 S.Ct. 340, 30 L.Ed.2d 285 (1971); *Longuest v. State*, 495 P.2d 575 (Wyo.), *cert. denied*, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972). *Contra, People v. Williams*, 557 P.2d 399 (Colo. 1976). The United States Supreme Court has not disapproved of any of these decisions.

We find the search of appellant's apartment falls within the murder scene exception to the Fourth Amendment warrant requirement. Although Officer Headricks may not have been dead before the search began, it was reasonable to believe that death was likely and that a murder charge was a possibility. The search was aimed at establishing the circumstances of death (bullet trajectories, e. g.) and included evidence relevant to motive and intent or knowledge (narcotics, e. g.). The search began when the investigative unit arrived, in accordance with Police Department procedures. For these reasons, the search was legal and the trial court's denial of appellant's motion to suppress was proper.

### Severance of the Murder Count

Appellant argues it was prejudicial, reversible error for the trial court to deny his motion to sever the murder count from the other counts listed in the indictment. We find no error. So long as the determination is within the guidelines of Rule 13.3 for joinder and Rule 13.4 for severance, of the Rules of Criminal Procedure, 17 A.R.S., it is within the trial court's discretion to deny appellant's motion. *E.g., State v. Williams,* 108 Ariz. 382, 499 P.2d 97 (1972); *State v. Buggs,* 108 Ariz. 425, 501 P.2d 9 (1972).

We find Rule 13.3(a)(2) controlling as to joinder in this situation:

"Rule 13.3 Joinder

"a. Offenses. Provided that each is stated in a separate count, 2 or more offenses may be joined in an indictment, information, or complaint, if they:

\* \* \* \* \* \*

"(2) are based on the same conduct or are otherwise connected together in their commission \* \* \*."

The murder, assault with a deadly weapon, and drug charges were all part of a continuing series of events, and are "otherwise connected together in their commission." *Cf. State v. Tynes,* 95 Ariz. 251, 389 P.2d 125 (1964).

Rule 13.4(a) provides the standard for severance:

"Rule 13.4 Severance

"a. In General. Whenever 2 or more offenses or 2 or more defendants have been joined for trial, and severance of any or all offenses, or of any or all defendants, or both, is necessary to promote a fair determination of the guilt or innocence of any defendant of any offense, the court may on its own initiative, and shall on motion of a party, order such severance.

\* \* \* \* \* \*

This Court will reverse the denial of a motion to sever only when a clear abuse of discretion is shown. *State v. Dale,* 113 Ariz. 212, 550 P.2d 83 (1976).

No such abuse of discretion, i. e., prejudice, can be shown here because the evidence as to the other counts would have been admissible at the murder trial even if severance had been granted. The evidence would be admissible on two bases: as relevant to the issue of intent and as part of the complete picture. *State v. Schmid, supra; State v. Villavicencio,* 95 Ariz. 199, 388 P.2d 245 (1964).

Since we find no prejudice, we hold the denial of the motion to sever was proper.

### Prosecutor's Closing Argument

Appellant points to a single statement in the prosecutor's closing argument and argues that it is so inflammatory and prejudicial as to deprive him of a fair trial:

"Don't tell every heroin pusher in town that he can have a gun; that he can have it loaded; that he can shoot a pig if he feels hassled and that all he need do, is take the witness stand and say, 'Yes, sir; no sir,' and claim that he had no idea that he was shooting a cop."

The rule in Arizona is that counsel may draw reasonable inferences from and appraise evidence which was adduced at trial. *State v. King,* 110 Ariz. 36, 514 P.2d 1032 (1973).

The statement in question is based on the evidence. There was testimony that

appellant was a heroin dealer, that he had a loaded gun, that he shot a police officer, and his defense was that he had no idea that he was shooting a police officer. It is a reasonable inference, if the evidence pointing to appellant's guilt is believed, that acquitting appellant might indicate to other heroin sellers that they could get away with the same thing.

The problem with the prosecutor's statement is that it is an emotional appeal to the jury's fears. Although in closing argument both counsel have wide latitude, *State v. Landrum,* 112 Ariz. 555, 544 P.2d 664 (1976), such an appeal to fear is improper. *Cf. State v. Makal,* 104 Ariz. 476, 455 P.2d 450 (1969); *State v. Huson,* 73 Wash.2d 660, 440 P.2d 192 (1968), *cert. denied,* 393 U.S. 1096, 89 S.Ct. 886, 21 L.Ed.2d 787 (1969). We need not determine, however, whether it was so prejudicial as to require reversal because we are reversing on other grounds, *supra.* If the murder and assault charges are retried on remand, we urge counsel to refrain from appeals to juror's fears.

### Conclusion

For the foregoing reasons, the judgment of the trial court as to Counts I (murder, first degree) and II (assault with a deadly weapon) is reversed and remanded for proceedings consistent with this opinion. The judgment of the trial court as to Counts III, IV and V (unlawful sale of narcotics, unlawful possession of narcotic drug for sale and unlawful possession of narcotic drug, respectively) is affirmed. Because the sentence for Count III was to run consecutively to that of Count I (IV and V were concurrent with III) we are remanding on Counts III, IV and V for resentencing.

CAMERON, C. J., and STRUCKMEYER, V. C. J., concur.

HAYS, Justice, specially concurring.

I concur with the majority in all respects except that I take exception to the characterization of the county attorney's statement in argument as being "an emotional appeal to the jury's fears." If oral argument at the close of the case is to have any purpose, it must be more than a dull and sterile discussion of the evidence. The condemned statement is based on the evidence and the inference drawn therefrom is reasonable. It does not deprive the defendant of legitimate defenses nor does it exceed the bounds of propriety.

HOLOHAN, J., concurs.