938 P.2d 457

STATE of Arizona, Appellee/Cross–Appellant,

v.

Jake Hurt HUGHES, Appellant/Cross–Appellee.

No. CR–92–0037–AP.

Supreme Court of Arizona,
En Banc.

May 6, 1997.

64

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals, Kent E. Cattani, Assistant Attorney General, Phoenix, and Stephen D. Neely, Pima County Attorney by Thomas J. Zawada, Deputy Pima County Attorney, Tucson, for Appellee/Cross–Appellant.

Stephanie J. Meade, Law Office of Stephanie J. Meade, Tucson, for Appellant/Cross–Appellee.

## OPINION.

ZLAKET, Chief Justice.

On October 24, 1986, 17–year–old Frankie Spencer disappeared. Six days later, her body was discovered in a remote desert area. She had been strangled to death. In January 1989, defendant Hughes was charged with first degree murder, hindering prosecution, and conspiracy. A jury convicted him on all counts. The trial judge sentenced him to death on the murder conviction and to consecutive 2.5–year prison terms for the other offenses. This automatic appeal followed. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 13–4031, and Rule 31.2(b), Ariz.R.Crim.P.

## FACTS AND PROCEDURAL HISTORY

It is undisputed that the victim was at defendant's apartment on the last day she was known to be alive. She went there in the early afternoon to meet one of his neighbors, who had agreed to photograph her for a portfolio. Around dusk, she hitchhiked out of that neighborhood. A note to her father and stepmother stating that she was returning to defendant's place, along with clothing from the photo shoot, established that Frankie had made it home. Whether she ever reached his apartment again is unknown.

There is limited physical evidence to show where the young woman was murdered or who did it. Her body was dressed in one of the outfits she had worn for the photos. Her shoes were never found, and her socks were relatively clean, indicating that she probably had been placed in the desert. A tourniquet made with nylon rope and a stick was around her neck.

On one sock, examiners found a dark-colored dog hair. A similar one was later re-

trieved from a 1964 Buick accessible to co-defendant David Lankisch. A human hair found in the vehicle did not match Frankie's, and one discovered on her blouse did not match any of the suspects'.

Because of decomposition, the medical examiner was unable to detect the presence of alcohol or drugs in Frankie's system. He also could not determine if she had been beaten, sexually assaulted, or bound at the wrists or ankles. Sperm found in her vagina indicated that sexual intercourse had taken place within 24 hours of death. Her fingernails were not broken, and no material was found underneath them.

Defendant allegedly made various statements to friends and a jailmate regarding the victim's disappearance and murder. Several weeks after the body was found, his former roommate, James Nelson, told police about a dream defendant described to him in which Frankie was beaten, dragged in the desert, and strangled. Even though he had not told authorities about it when first questioned, Nelson claimed that this conversation took place the day after Frankie disappeared.

While incarcerated for an unrelated arson in December 1986, defendant revealed to fellow inmate Joe Salerno that he had given two juveniles some crack cocaine to "off" his fiancée. He said they hurt her worse than he wanted. She had been tortured, dragged, and left in the desert, allegedly because she would not marry him.

In October 1989, after having made two separate statements that he knew nothing of the murder, Charles Coleman claimed that before the victim's body was found, defendant and co-defendants David Lankisch and Christopher Scherf had joked about putting a noose around Frankie's neck, dragging her with it, and leaving her in the desert.

In 1987, a grand jury failed to return an indictment. In January 1989, a second grand jury charged defendant and Lankisch with one count each of first degree murder. The men were also indicted, together with Scherf, for first degree hindering prosecution and conspiracy to commit a class five felony (hindering prosecution). The charges against Scherf were eventually dropped. Lankisch,

tried separately, was found guilty of premeditated murder. After a successful motion for new trial based on newly-discovered evidence, Lankisch pled guilty to lesser charges and was placed on probation.

Defendant's trial commenced in May 1990, and he was convicted on all counts. In its verdict, the jury indicated that he was guilty of murder only as an accomplice. At sentencing, the trial court found three aggravating factors: (1) a prior felony conviction involving the use or threat of violence on another person, *see* former A.R.S. § 13–703(F)(2); (2) procurement of others to commit the crime by payment or promise of payment, *see* A.R.S. § 13–703(F)(4); and (3) a killing that had been committed in an especially heinous, cruel or depraved manner, *see* A.R.S. § 13–703(F)(6). Following a mitigation hearing, the trial judge determined that the proffered evidence was not sufficiently substantial to call for leniency and sentenced defendant to death.

## DISCUSSION

### I. *Character Evidence*

Before trial, defendant filed a motion to determine the admissibility of other crimes, wrongs, and acts sought to be introduced by the state. As described by the prosecution, these included:

> [E]very other bad act, and every statement that your client made that I have disclosed to you. That would include evidence of the [sic] David Lankisch attempting incest with his sister, David Lankisch inserting objects into the vagina of Joselyn DePaul; the sexual relations between David Lankisch and Jake Hughes; all of the evidence regarding the drug dealing and transactions at Jake's house and his drug transactions with any and all witnesses; the knife incident in which he threatened Jim Nelson, the brake line incident in which Jim Nelson cut the brake lines of someone's car on behalf of Jake Hughes; the incident in which Jake indicated to Jim Nelson he had someone shoot a garbage can; the incident in which a bullet was shot through a window at Mike Rincon's house; Jake's sex act with Rebecca; Jake's statements to

Detective Manricky regarding strangulations; Jake's act of pointing a gun at Jim Nelson's face; the fire bombing of Michelle's apartment; the fire bombing of Jim Nelson's car; the firebombing of Kelly Choitz' car; the shooting out of the windows of Vaunda's automobile; any and all statement of Jake Hughes regarding murder, other crimes in which he was involved, his criminal connections, his drug trafficking, his sexual activities, and any and all statements by both of these gentlemen and [sic] they relate to other acts.

. . . .

Jake's act of asking Alexander Lee to let him have sex with his wife and to let him film Alex and his wife having sex.

According to the state's theory of the case, defendant had commanded two juveniles to kill Frankie because she spurned his love, owed him money, and interfered with his marijuana business. The prosecutor urged admission of the foregoing acts and statements to establish defendant as a "Charles Manson-type" person who exerted control over a group of juvenile delinquents, in particular co-defendant Lankisch. The state maintained that the evidence would prove defendant's ability to manipulate others, even to the extent of inducing homicidal conduct.

Following a hearing on defendant's motion, the judge issued a minute entry that simply listed, without comment, the evidence she would allow:

1. Jake Hughes' statement to Alex Lee that Frankie Spencer had hurt him, etc.

2. Jake Hughes' prior conviction re: Michelle Phifer.

3. Jake Hughes' statements to [Joe] Salerno.

4. Jake Hughes' drug activity at his residence involving any of co-defendants and involving Frankie Spencer.

5. Jake Hughes' statement to Kevin Sold re: Frankie Spencer stealing money from Jake Hughes, etc.

6. Jake Hughes' statement to Detective Manricky regarding strangulation.

7. David Lankisch's admission to selling drugs out of Jake Hughes' house.

8. Jake Hughes' alleged statement to Frankie Spencer in Kelly Conway's presence re: tying Ms. Spencer and having sex with her. Defendant may rebut with Mr. Conway's recollection re: the conversation.

9. Jake Hughes' and David Lankisch's statements made in Charles Coleman's presence re: Frankie Spencer.

10. Jake Hughes' statements to Frankie Spencer in David Turton's presence re: going to the desert, hanging her from tree, tying her hands, etc. Defendant may introduce rebuttal evidence on this.

11. The two photographs showing rope, twine, and a shoe lace.

Just before the start of trial, the case was transferred to Judge Fleischman. Although initially stating that he planned to abide by his predecessor's rulings, the judge revisited, at the prosecutor's urging and over defendant's objection, many of the acts and statements previously precluded. He thereafter ruled that four general categories of evidence would be relevant: (1) defendant's relationship with the victim; (2) his reaction to the murder; (3) his retaliatory responses in threatening situations; and (4) his utilization of other people, including juveniles, to do certain deeds. Ultimately, testimony regarding defendant's drug dealing, verbal and physical threats, and miscellaneous acts of violence, including three arsons, was admitted in evidence.

Defendant asserts that much of the evidence lacked relevance. *See* Rule 402, Ariz. R.Evid. He says the state sought to prove only that he had a general propensity for violence, which constitutes improper character evidence under Rule 404, Ariz.R.Evid. He also argues that there was insufficient proof of some of the acts, *see Huddleston v. United States,* 485 U.S. 681, 685–87, 108 S.Ct. 1496, 1499–1500, 99 L.Ed.2d 771 (1988); *State v. Marahrens,* 114 Ariz. 304, 307, 560 P.2d 1211, 1214 (1977), and that any probative value of the admitted evidence was substantially outweighed by the danger of unfair prejudice. *See* Rule 403, Ariz.R.Evid. Finally, he challenges the trial judge's modification of the earlier evidentiary rulings.

## A. Other Crimes, Wrongs, or Acts

The court admitted detailed evidence of defendant's involvement in the firebombing of Michelle Phifer's apartment. Rebecca Lankisch testified that her brother David threw a molotov cocktail through Phifer's window because he was "taking care of business" for defendant, who had offered to pay $200 for the deed. James Nelson told the jury that defendant was angry with Phifer because she had crossed him in a drug deal. Charles Coleman stated that defendant responded to news of the arson by proclaiming, "The bitch finally paid," and by telling others she had been taught a lesson. Other witnesses confirmed that defendant wanted the apartment burned because Phifer owed him money.

In addition, the trial court permitted Nelson to relate instances in which he had been threatened by defendant. These included the firebombing of his car (allegedly for moving out of their apartment), having a loaded gun put to his head, and being chased with a knife. Nelson was also allowed to describe defendant as a person who sought revenge:

Q. Did he indicate to you if people—if he felt that people had done him wrong that he would retaliate and do something to hurt them in return?

A. Yes.

Q. Did you know the defendant to deal drugs?

A. Yes, I did.

Q. And did you have conversations with Mr. Hughes about people who he supplied drugs to who maybe wouldn't pay him or couldn't pay him?

A. Yes.

Q. Did he indicate to you that people who didn't pay him would become an accident?

A. Yes, they did.

. . . .

Q. Over the time that you met Mr. Hughes did you have—I guess you've indicated you've had conversations with him about what he would do if people did him wrong?

A. Yeah.

Q. Did he indicate to you that it wasn't his style to do things himself to these people who had done him wrong?

A. Yes.[1]

Finally, the court admitted testimony from ten separate witnesses regarding defendant's drug dealing, many of whom related details of their own transactions with him. Some reported general threats he had made in the past. For example, Alex Lee testified as follows:

Q. Mr. Lee, do you recall an occasion when you were having a conversation with Jake and he had the opportunity to pull out a knife?

. . . .

A. Yes.

Q. And at that time he was trying to prove a point to you, was he not?

A. Yes.

. . . .

Q. And he was trying to prove to you that if somebody had something over you that you would do what they said?

A. That's correct.

Q. And on this occasion you were sitting on a couch and he came close to you and stabbed a couch right next to you?

A. That's correct.

Q. He told you as well if you were in danger that you would do what he said?

A. Yes.

Q. And in fact you had many conversations about that type of thing?

A. Yes.

Q. . . . Did he ever tell you that if you hurt him or anything along those lines he said he'd wait ten years to come after you?

A. That's correct.

Q. And if not, one of his followers would?

A. I never heard him say about his followers. I knew if you mess with Jake you're going to pay a price.

---

1. The record is replete with leading questions. The judge, while acknowledging continuing objections from the defense, instructed the prosecutor to lead several of the witnesses in an apparent attempt to confine the testimony to only those other acts specifically admitted.

Another witness, David Holt, added that defendant claimed he would get his money one way or another if someone owed him for drugs. Kevin Sold further corroborated the image of defendant as a man who retaliated when crossed:

> Q. During the course of the time that you would see the defendant, did he ever discuss with you his drug dealings and what would happen to people if they didn't—if they screwed him?
>
> A. Yeah.
>
> Q. When we're talking about if they screwed him, what are we talking about?
>
> A. If they were to rip him off and stole from him.
>
> Q. What did he tell you?
>
> A. That he didn't like if people did it. People could get hurt that way.
>
> Q. Did he ever say what he would do?
>
> A. Not specifically. It was again: Accidents happen.

Rule 404, Ariz.R.Evid., prohibits evidence of a person's bad character in order to prove a propensity for committing crimes. The danger sought to be avoided is that such evidence has "relatively slight probative value compared to the risk of misuse by the jurors." Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 83, at 170 (3rd ed.1991).

> The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge.

1A John H. Wigmore, *Evidence* § 58.2, at 1212 (Tillers rev.1983). Rule 404(b) makes an exception for evidence of crimes, wrongs, or acts offered for some relevant purpose other than proving conformity with character. Even when a proper basis is articulated, however, the evidence should nonetheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Rule 403, Ariz.R.Evid.

The state argues that the Phifer and Nelson arsons, exhibiting defendant's response to those who angered him, demonstrated intent and modus operandi. It also claims that the Phifer firebombing illustrated defendant's control over Lankisch and established a common scheme or plan of using juveniles to commit crimes. As for other acts of violence against Nelson, the state asserts they were relevant to put his testimony "in perspective" and to understand that he believed defendant's threats were serious. Likewise, it argues that the couch-stabbing incident demonstrated Lee's belief that defendant was not bluffing when he suggested that people would "pay a price" if they messed with him. Lastly, according to the state, defendant's narcotics activity and related comments regarding what he would do to people who "crossed him" were unavoidable and relevant because his occupation at the time of the murder was that of a drug dealer, his relationship with the victim centered on drugs, and one possible motive for the murder was that she had interfered with his business.

### 1. Phifer firebombing

Because the trial court deferred to the first judge's cursory ruling regarding the Phifer arson, there is nothing in the record indicating the specific basis on which it was admitted. We therefore consider each of the state's proffered non-character purposes. *See State v. Sardo*, 112 Ariz. 509, 515, 543 P.2d 1138, 1144 (1975) (evidentiary determinations should be affirmed if legally correct on any ground).

▪ To establish identity based on other acts, " 'the modus operandi of and the circumstances surrounding the two crimes must be sufficiently similar' as to be like a signature." *State v. Jackson*, 186 Ariz. 20, 27, 918 P.2d 1038, 1045, *cert. denied*, — U.S. —, 117 S.Ct. 527, 136 L.Ed.2d 413 (1996) (citations omitted). We have trouble accepting the state's claim of "striking similarities" between the strangulation murder and the molotov cocktail arson. At best, there are only two likenesses—both victims were women who had angered defendant and David Lankisch may have been paid to commit the crimes. We do not agree that these are sufficient to identify defendant as an accom-

plice to murder. *Cf. State v. Harding*, 137 Ariz. 278, 290, 670 P.2d 383, 395 (1983)("striking similarities" existed where both victims had stayed at hotels, were similarly hog-tied and gagged, and had personal effects and vehicles stolen).

■ The assertion that the firebombing was part of a common scheme or plan is equally meritless. For purposes of establishing this 404(b) exception, the other act evidence must establish "a particular plan of which the charged crime is a part." *State v. Ives*, 187 Ariz. 102, 106–07, 927 P.2d 762, 766–67 (1996). Mere similarity does not, by itself, prove that the conduct was part of a common scheme or plan. *Id.* at 107, 927 P.2d at 767. The state contends that defendant's pattern of striking back at those who angered him and his use of juveniles to commit crimes demonstrate a distinct strategy. The argument, however, is merely another way of saying that defendant acted in conformity with his prior bad acts, the very essence of what Rule 404(b) forbids. The common scheme or plan exception requires something more than mere criminal tendencies. *See* Morris K. Udall et al., *Arizona Practice: Law of Evidence* § 84, at 185–86 (3rd ed. 1991) ("[T]he distinction [for 404(b) purposes] is between proving a specific plan embracing the charged crime and proving a general commitment to criminality...."); *State v. Ramirez Enriquez*, 153 Ariz. 431, 432–33, 737 P.2d 407, 408–09 (App.1987). Other than defendant's propensity for violence, there simply is no evidence tying these acts together as part of some over-arching criminal scheme. *Cf. State v. Grainge*, 186 Ariz. 55, 58, 918 P.2d 1073, 1076 (App.1996) (in prosecution for sexual offenses involving two minors, evidence of furnishing marijuana to one of them admissible as part of defendant's plan to seduce the victim).

■ Likewise, we cannot accept the state's contention that the Phifer firebombing, as well as the Nelson car arson, show defendant's intent. Where, as here, the accused denies any involvement in the charged offense, the "intent" exception of 404(b) is not a proper basis for injecting prior misconduct into a proceeding. *Ives*, 187 Ariz. at 110, 927 P.2d at 770 ("Unless there is some

discernible issue as to defendant's intent (beyond the fact that the crime charged requires specific intent), the state may not introduce evidence of prior bad acts as part of some generalized need to prove intent in every case."). These acts were unrelated, isolated instances. *See State v. Woody*, 173 Ariz. 561, 563, 845 P.2d 487, 489 (App.1993) ("Evidence of a prior crime, act, or wrong cannot be introduced to prove a defendant's mental state unless it is similar to the act for which the defendant is on trial.").

■ Finally, the state asserts that the apartment firebombing was relevant to show defendant's control over Lankisch. We agree. In his jailhouse statement to Salerno, defendant said he gave two juveniles cocaine to commit the murder. Evidence that Lankisch had previously worked for defendant tended to identify him as one of those juveniles. Relevancy notwithstanding, however, the admitted evidence went far beyond that necessary to establish the relationship between Lankisch and defendant. Because most of the witnesses discussed the Phifer arson in the context of defendant's retaliatory character, there is a substantial risk that the jury considered this evidence for an improper purpose. *See* Rule 403, Ariz.R.Evid.; *State v. Salazar*, 181 Ariz. 87, 92, 887 P.2d 617, 622 (App.1994).

### *2. Nelson incidents*

■ During the state's offer of proof regarding the car arson, gun threat, and knife incident, the prosecutor avowed that Nelson would testify about a threat defendant allegedly made *after* the victim's body was found that he would "have an accident" if he talked to the police. Although defendant did not challenge the admissibility of the statement itself, the trial court ruled that details of these other incidents would be admitted to show whether Nelson took the threat seriously. He later added that they would also show defendant's response to threatening situations, "as well as his relationship with Mr. Nelson, who's apparently going to be a pretty important witness."

Concerning the threat, however, Nelson testified to only the following:

Q. Did Jake *ever* have conversations with you about you talking to the police?

A. Yes, he did.

Q. And what was it that he told you?

A. That if the police contacted me I was—I was supposed to say nothing. I didn't know anything. To play stupid.

Q. Did he *ever* tell you what would happen to you if you talked to the police?

A. Yeah. I would become one of his accidents.

Q. Did he *ever* indicate to you what would happen to you if he got busted?

A. Yes, he did.

Q. What did he indicate to you?

A. That I would be an accident either when it happened or if and when he gets out.

(Emphasis added). Even if we assume that this conversation referred to the murder rather than defendant's other illegal activities, and that it took place after the victim's body was found, whether Nelson thought defendant's threats were serious was essentially irrelevant. He admitted during cross-examination that he never hesitated in talking to the police. There also was no suggestion that his delay in telling authorities about defendant's dream occurred because he feared retaliation. *Cf. State v. Williams,* 183 Ariz. 368, 376, 904 P.2d 437, 445 (1995) (attempted murder of a witness admissible to explain another's initial refusal to tell the truth about charged crime); *State v. Jeffers,* 135 Ariz. 404, 417, 661 P.2d 1105, 1118 (1983) (assaults on others admissible to explain witness's fear of defendant and reason for delayed reporting). Moreover, as previously noted, defendant's "pattern of retaliating when crossed" is just another way of saying "propensity for violence." Thus, it too was an improper basis for admitting the arson, gun, and knife incidents.

### 3. Lee incident

■ Having reviewed the entirety of Lee's testimony, we can discern no legitimate reason for admitting the couch-stabbing incident and related threat. As with Nelson, there is no assertion that the witness changed his testimony or lied to police out of

fear of defendant. This evidence served only to paint defendant as a violent, aggressive person, in direct contravention of Rule 404(b).

### 4. Drug dealing

■ Defendant concedes that his drug involvement with the victim was relevant to motive. The state presented evidence that he believed Frankie was stealing his customers, had once used some drugs that were supposed to be sold, and owed him $175. Defendant argues, however, that the extensive testimony of his illegal dealings by no less than 10 witnesses went far beyond what was necessary to establish motive. We agree. That defendant regularly sold drugs to others could only have reinforced in the jurors' minds that he was a bad person—someone who had a propensity for committing crimes. He was not on trial for selling or possessing narcotics. It was therefore incumbent on the trial court, under Rule 403, to limit the evidence to its probative essence (motive) by excluding irrelevant or inflammatory detail. *See Salazar,* 181 Ariz. at 92, 887 P.2d at 622. No such attempt was made here.

Moreover, we cannot agree with the state that the testimony from Holt, Sold, and Nelson regarding defendant's threats to strike back at those who ripped him off in drug deals was "unavoidable." On the contrary, the evidence should have been excluded because the only possible basis for its admission was to show that defendant acted in conformity with a violent, vengeful character.

### B. Other Statements
#### 1. Choitz firebombing

During grand jury proceedings, Kelly Choitz testified to her belief that defendant firebombed her car after she had confronted him about being a bad influence on the Lankisch siblings. There was no other evidence of defendant's involvement, and he was never charged with the crime. At trial, the prosecutor argued for admission of a statement defendant made to Don Porterfield in response to having been accused of burning the vehicle. Defendant allegedly said, "I don't

do chickenshit stuff like that, if I have something out for someone I kill them."

The trial judge admitted the remark as a statement of intent, *see* Rule 803(3), Ariz. R.Evid., basing his ruling on *State v. Mincey,* 115 Ariz. 472, 566 P.2d 273 (1977), *rev'd,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (*Mincey I*); *State v. Mincey,* 130 Ariz. 389, 636 P.2d 637 (1981) (*Mincey II*); and *State v. Mincey,* 141 Ariz. 425, 687 P.2d 1180 (1984) (*Mincey III*). Rufus Junior Mincey was convicted of second-degree murder for killing an undercover narcotics officer. This court affirmed the admission of comments, made several weeks before the crime, that he wanted to cut down a shotgun "in case he ever get hassled by pigs" and would use the weapon to "kill a pig if they get in my way." *Mincey III,* 141 Ariz. at 435, 687 P.2d at 1190. Because the statements referred to a specific class of persons (police) of which the victim was a member, this court found that they were relevant to establish defendant's intent to take the life of another. *Mincey I,* 115 Ariz. at 481, 566 P.2d at 282; *Mincey III,* 141 Ariz. at 435, 687 P.2d at 1190.

■ Here, defendant argued that because the statement had nothing to do with the victim, its probative value was substantially outweighed by the danger of unfair prejudice. *See* Rule 403, Ariz.R.Evid. Believing defendant's objection "really goes to the weight, not the admissibility" of the statement, the court observed that defendant's remark was no different than one in which a person accused of murdering a spouse has said, "I'm angry at my spouse and I want to kill her." This suggests that the judge missed the point of defendant's objection, and the record does not indicate whether he considered anything other than relevance in admitting the statement. *See State v. Taylor,* 169 Ariz. 121, 125, 817 P.2d 488, 492 (1991) (encouraging explicit Rule 403 weighing).

Ordinarily, a general threat to do harm, not expressly directed at the victim, has little probative value unless it is connected in some way to the charged offense. 41 C.J.S. *Homicide* § 204, at 44 (1991). We agree with the state that the victim here was within an identifiable category of persons—those who crossed defendant. However, the remark encompassed such a broad spectrum of individuals that its worth was highly questionable. *See State v. Bible,* 175 Ariz. 549, 593, 858 P.2d 1152, 1196 (1993) (statement about a large group not overwhelmingly probative). We must also consider the circumstances under which the statement was made in assessing its probative value. Unlike in *Mincey,* where the accused anticipated police infiltration of his drug operation, the instant comment was more akin to generalized puffing or bragging. Although the remark may have been marginally relevant to identify defendant as the culprit, we believe the risk was too great that the jury would improperly consider it as evidence of his bad character.

### 2. Views of women

■ Over objection, the trial court allowed Nelson to testify as follows:

Q. During the time that you knew Jake and lived with Jake did he ever discuss with you women?

A. Yes.

Q. And how did he react to women?

. . . .

A. Well, he was very possessive, and a woman had her place and she did what he wanted her to do, but if you're a good friend of Jake's you could do whatever you would like as far as bodywise goes, but he wanted her mind.

Q. He what?

A. He wanted her mind.

Q. What do you mean by that?

A. He wanted to manipulate her around, get her to do the things he wanted to do.

Defendant characterizes the foregoing as testimony of an irrelevant prior bad act. Although in our view these statements are not "other acts" for purposes of Rule 404(b), we agree they lacked relevance. There was no basis for offering such testimony other than to show that defendant acted in conformity with a negative view of women and a desire to use them. *See, e.g., State v. Johnson,* 71 Ohio St.3d 332, 643 N.E.2d 1098, 1105 (1994) (hatred of women a character trait). Be-

**72**

cause this type of evidence is prohibited by Rule 404(a), and there is no claim that defendant placed his character in issue, the court erred in admitting it.

### C. Harmless Error Analysis

■ Assuming, without deciding, that it was proper to revisit the first judge's evidentiary rulings, the court abused its discretion in admitting the evidence of other wrongful acts. As a result, the case was saturated with improper inferences of defendant's bad character. Moreover, permitting testimony of defendant's threat to kill anyone he had "something out for" accentuated the image of defendant as a violent, aggressive person.

It is clear from the prosecutor's closing argument that he wanted the jury to focus on defendant's propensity to retaliate:

What's he going to do, ladies and gentlemen, when somebody rips him off? What's he going to do when somebody pisses him off? What's he going to do when somebody hurts him? Listen to him. He's been telling everybody all along.

Although the state presented significant circumstantial evidence of defendant's guilt, many of the witnesses had credibility problems. It is thus no surprise that the prosecution, in closing, recounted every bad act admitted as well as the descriptions of defendant's threatening personality. *See State v. Charo,* 156 Ariz. 561, 563, 754 P.2d 288, 290 (1988) (use of evidence in closing arguments belied claim that it was unimportant). Additionally, we note that the state failed to put forth any claim of harmless error. It is also significant that the jury found defendant guilty on counts 2 and 3 even though, as discussed hereinafter, there was little support for those convictions.

The volume of improper character evidence admitted in this trial was overwhelming. Because we cannot say beyond a reasonable doubt that the jury's verdict was not influenced by these errors, we must reverse the convictions and remand for a new trial. *See State v. Grannis,* 183 Ariz. 52, 57, 900 P.2d 1, 6 (1995); *Charo,* 156 Ariz. at 563, 754 P.2d at 290.

### II. *Other Issues*

Several other evidentiary challenges may arise again on retrial, so we discuss them here. We also address defendant's Rule 20 arguments regarding counts 2 and 3. All remaining issues, including those raised in the state's cross-appeal, are moot.

### A. Expert Testimony

■ The prosecution offered Lowell Crace as a knot expert. He testified that he had been a military interrogation specialist and, in that capacity, had occasion to view the use of various restraint methods. Defendant argues that such observation does not constitute specialized experience in knots and ropes. He now also asserts that military personnel are not authorized to testify as witnesses, citing 32 C.F.R. § 516.49, and claims that Crace's statements about prisoners of war added a sinister aura to the proceedings, inflamed the jurors' passions, and failed to assist them in their deliberations.

■ We note that the latter issues were not raised below. Moreover, although initially objecting on foundational grounds, defense counsel failed to re-assert his opposition after the court heard additional testimony and qualified the witness. Waiver notwithstanding, there was no error. An expert may give an opinion based on either actual experience or careful study of a subject. *State v. Richards,* 166 Ariz. 576, 578, 804 P.2d 109, 111 (App.1990). Here, the state established that Crace had been in the Army for 25 years, received training in Vietnam and military interrogation schools, worked in various capacities with prisoners and detainees, and had seen hundreds of people tied up with ropes. Additionally, we disagree with defendant's reading of 32 C.F.R. § 516.49 and find that the trial judge acted within his discretion.

### B. Victim's Letters

■ To establish the victim's state of mind pursuant to Rule 803(3), Ariz.R.Evid., the state introduced an excerpt from a letter she wrote two weeks prior to her disappearance. It reads:

I'm not seeing Jake anymore. He says he wants me out of his life because I hurt him too much. He's in love w/me, ya know, and I guess he really hates it because Dave [Lankisch] and I slept together and I won't let him touch me. (and I never will) Just between me and you, it's because he's black. You probably know that tho. If he was white I'd probably marry him or something dumb like that.

Defendant argues that the court erred in refusing to admit the entire letter as well as two others written by the victim on the same day. He asserts that the three letters, taken together, best represented the victim's state of mind because they showed she was not involved with anyone, including himself. He points to Rule 106, Ariz.R.Evid., which states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of *any other part* or *any other writing* or recorded statement which ought in fairness to be considered contemporaneously with it." (Emphasis added). Rule 106, however, does not require the admission of irrelevant or prejudicial evidence. *See State v. Passarelli*, 130 Ariz. 360, 363, 636 P.2d 138, 141 (App.1981); *see also* 1 John W. Strong et al., McCormick on Evidence § 56 (4th ed.1992). Here, the proffered material was irrelevant because at issue was whether she had rejected defendant, not whether a "serious" relationship existed between them.

## C. Gruesome Photographs

The trial court admitted two gruesome photographs of the victim. Defendant argues that the exhibits were highly inflammatory and prejudicial because the body was in a state of decomposition. He also claims they were irrelevant because he did not contest the cause of death.

The admission of photographs is reviewed for an abuse of discretion. *State v. Amaya–Ruiz*, 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990). It involves a three-part inquiry: (1) relevance; (2) tendency to incite passion or inflame the jury; and (3) probative value versus potential to cause unfair prejudice. *State v. Murray*, 184 Ariz. 9, 28, 906 P.2d 542, 561 (1995), *cert. denied,* —

U.S. ——, 116 S.Ct. 2535, 135 L.Ed.2d 1057, *and cert. denied,* — U.S. ——, 117 S.Ct. 193, 136 L.Ed.2d 130 (1996).

Exhibit 22 depicts the victim's back and shows the placement of the stick within the noose, as well as the length of the rope. Although unpleasant, the photograph was relevant and not unduly prejudicial because there was some dispute as to whether the victim had been bound at the hands and/or feet and whether the stick was used as a torture device.

Exhibit 20 is a side view of the victim in the morgue. It portrays the condition of her clothing and the discoloration of her face. Although this picture is also gruesome, we do not find it unduly prejudicial.

## D. Sufficiency of Evidence on Counts 2 and 3

Defendant's motion for directed verdict on the hindering prosecution and conspiracy to hinder prosecution charges was denied by the trial court. *See* Rule 20(a), Ariz.R.Crim.P. Judgment of acquittal is appropriate when there is no substantial evidence to warrant a conviction. *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990). Substantial evidence is more than a "mere scintilla" and is that which reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt. *Id.* We view the evidence in a light most favorable to sustaining the verdict. *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987).

To prove hindering prosecution, the state must show "that a defendant intended to hinder the apprehension, prosecution, conviction, or punishment of *another* for a felony and that the defendant rendered assistance to such person." *State v. Fisher*, 141 Ariz. 227, 248, 686 P.2d 750, 771 (1984)(emphasis added); A.R.S. § 13–2512. "Assistance" includes intimidating any person from aiding in the discovery, apprehension, prosecution or conviction of another, and knowingly concealing evidence. A.R.S. §§ 13–2510(4),(5). A conviction of conspiracy requires proof of an intent to promote or aid in the commission of the offense, an agreement with another to engage in conduct constituting the offense, and an overt act in furtherance of the offense. *State v. Newman*, 141 Ariz. 554, 559, 688 P.2d 180, 185 (1984); A.R.S. § 13–1003(A).

The state argues that when he threatened to hurt Nelson if he talked to the police, defendant attempted to obstruct further investigation of Lankisch. As proof of concealment and a conspiracy to hide evidence, it points to accounts from defendant's neighbors, who heard three sets of footsteps and a car speeding away on the night of the victim's disappearance. The state also relies on defendant's comments to Coleman about the victim's body being left in the desert. In response, defendant asserts there is no proof anything was concealed. He claims the state's position is premised on the assumption that evidence must have been hidden because the police could find nothing linking him to the crime. Moreover, he says, the state failed to relate the Nelson threat to the killing.

We agree with defendant that Nelson's testimony is inadequate proof of an intent to hinder either Lankisch's or Scherf's prosecution. As the record reflects, the prosecutor did not show *when* the statements were made. *See supra,* at 70, 938 P.2d at 465. Significantly, the witness claimed that he last spoke to defendant on the day he described his dream. This allegedly took place after the victim disappeared but before her body was found. Yet, the prosecution made no attempt to tie the "don't talk to police" threat to this final conversation or to connect it with the murder rather than the numerous other illegal activities described by the witness. Nelson's testimony, standing alone, is not enough to support the hindering prosecution conviction.

The remaining evidence relied on by the state is equally insufficient. To say that defendant faces a separate criminal prosecution for concealing the victim's body, thereby inhibiting the investigation of co-defendants, is tantamount to charging him with hindering his own prosecution. Such a result is not supported by the statute's common-law underpinnings as an "accessory after the fact" crime, one which was "a distinct, independent offense." *State v. Sims,* 99 Ariz. 302, 309, 409 P.2d 17, 21 (1965); A.R.S. § 13–141 (repealed 1976); *see also Goodwin v. State,* 644 So.2d 1269, 1274 (Ala.Crim.App.1993)(cannot indict for hindering prosecution of others

where defendants' own charges arise from the same set of facts); *State v. Pugh,* 55 Or.App. 305, 637 P.2d 1325, 1329 (1981) (cannot convict defendant of hindering prosecution of co-defendant where defendant's conduct served his own interest against self-incrimination).

Finally, we can identify nothing in the record that would support a finding that there had been an agreement between defendant, Lankisch, and Scherf to hinder each other's prosecution. *See State v. Sullivan,* 68 Ariz. 81, 87, 200 P.2d 346, 350 (1948) ("Conspiracies cannot be established by suspicions.... Mere association does not make a conspiracy.") (citation omitted). Because there is insufficient evidence of hindering prosecution or conspiracy, we must reverse counts 2 and 3 with prejudice.

### DISPOSITION

We reverse defendant's convictions and remand to the trial court for further proceedings consistent with this opinion.

FELDMAN, MOELLER and MARTONE, JJ., and ROBERT J. CORCORAN, J. (Retired), concur.