NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

LEROY ELLIS, JR., *Appellant*.

No. 1 CA-CR 25-0230

FILED 06-26-2026

---

Appeal from the Superior Court in Maricopa County
No. CR2022-135237-001
The Honorable Tracey Westerhausen, Judge (Retired)

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Michael J. Dew Attorney at Law, Phoenix
By Michael J. Dew
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Brian Y. Furuya and Judge James B. Morse Jr. joined.

---

**J A C O B S**, Judge:

¶1  Leroy Ellis Jr. appeals his convictions and sentences for child sex trafficking.  He argues the superior court erred by admitting evidence of prior communications between Ellis and an undercover police officer.  Because the court admitted the evidence for a proper non-propensity purpose under Arizona Rule of Evidence ("Rule") 404(b) after Ellis placed his ability to communicate and related characteristics at issue, we affirm.

## FACTS AND PROCEDURAL HISTORY

### A.  Investigators Identify Ellis as "Maccpheen," Leading the State to Charge Him with Child Sex Trafficking.

¶2  In September 2022, officers from the Phoenix Police Department ("PPD") arrested Ellis after an investigation into reports that a minor was trafficked for prostitution in Arizona.  PPD received a tip that a fifteen-year-old girl from California (who we refer to by the pseudonym Susan, to protect her identity as a victim) was brought to Phoenix and was being trafficked by someone known as "Maccpheen."

¶3  PPD officers found online advertisements with pictures of Susan on websites including MegaPersonals, Escort Alligator, and Escort Babylon.  They observed photographs in the advertisements, including one depicting Susan's chest with a tattoo of the name "Leroy Ellis, Jr." and another depicting a forearm tattoo reading "Maccpheen."  Police databases revealed Maccpheen was an alias associated with Ellis.  Other social media accounts and online content suggested Ellis was Maccpheen.  After identifying Ellis as a suspect, detectives used a phone number listed in an advertisement to arrange for an undercover detective to meet with Susan at Ellis' apartment complex.  Although the meeting did not occur, officers observed Susan leave the apartment complex with Ellis.  Officers arrested Ellis during a traffic stop and seized cellular devices associated with Ellis and Susan.  Forensic examination of those devices revealed online advertisements, communications relating to prostitution activity, and messages exchanged with the undercover detective through the phone number listed in the advertisements.

¶4  A grand jury charged Ellis with nine counts of child sex trafficking.  The indictment alleged Ellis recruited Susan from California, arranged for her travel to Arizona, posted online advertisements for her services, and received money she earned from acts of prostitution.

**B.** **The Court Limits the State's Use of Ellis' Prior Attempted Pandering Conviction Under Rule 404(b), But Explains That Ellis Could Open the Door to its Use in Rebuttal.**

¶5          Before trial, the State moved to introduce evidence at trial that, in 2014, Ellis communicated through text messages with an undercover police officer posing as a young woman and attempted to recruit her into prostitution, resulting in his pleading guilty to attempted pandering.  The State argued this evidence was admissible under Rule 404(b) because the 2014 conduct was substantially similar to the conduct alleged in this case, so it could show Ellis' intent, plan, knowledge, or absence of mistake.  Ellis argued the evidence was inadmissible, because the attempted pandering offense was more than eight years before the 2022 charges, was not sufficiently similar to the charged offenses, and would invite the jury to conclude that — because he had previously attempted to entice an adult woman into prostitution — he committed the charged offenses.  Ellis further asserted he had been found to be "mentally retarded with an IQ of 61," "basically illiterate with a third grade level of reading and writing," and "cognitively incapable of planning child sex trafficking activities."  Ellis claimed Susan prostituted herself without his knowledge.

¶6          In a November 2024 written order, the court granted the State's motion in part, "precluding the State from eliciting testimony of the Defendant's other acts during [its] case-in-chief only."  The order explained, however, that "[t]he State may bring in the Defendant's other acts should he testify."  During a pretrial hearing in January 2025, the court fleshed out this ruling: Ellis could present limited observation evidence of his communication abilities and behavioral characteristics, including evidence he was gullible, naive, or easily manipulated.  However, he could not present "diminished capacity evidence" because it "is not admissible in Arizona to negate mens rea."  The court explained witnesses could testify to Ellis' behavioral tendencies, such as whether Ellis could read, write, use a cell phone, send texts, exchange money, drive, or perform like tasks, but could not offer diagnoses, IQ evidence, or opinions that Ellis lacked the capacity to commit the charged offenses.  The court also explained that if Ellis presented evidence suggesting he could not perform the activities through which the charged offenses were allegedly done, the State could rebut that evidence with prior acts showing that he could do those things.  Such evidence could include prior texting, and videos depicting him using a phone, exchanging money, or engaging in related conduct.

### C. Ellis' Aunt and a Neuropsychologist Testify Ellis Was a Poor Communicator, Gullible, Naive, and Easily Manipulated, and Couldn't Function Independently.

¶7 Although Ellis did not testify, his defense was that Susan manipulated him and exploited his intellectual and communication limits. During opening statements, Ellis' counsel suggested Susan "took advantage of" Ellis, and that Ellis lacked the sophistication and independence necessary to do what the State alleged. Counsel argued Ellis never had a job, lived on disability benefits, and depended on his aunt for everything, including "living arrangements . . . food . . . [and] clothes." Counsel concluded "[i]t was [Susan] who manipulated [Ellis]."

¶8 Ellis called his Aunt Fay, who raised him. She testified he was born prematurely, experienced developmental delays, and attended special-education classes. She explained he needed her to assist him as an adult, so she selected and paid for his apartments, helped purchase his groceries, communicated with him mostly by phone because she often couldn't understand his texts, and visited him almost daily. She testified Ellis struggled to communicate with others and was "gullible," "naive," "didn't really understand things as well," and was "easily manipulated or told to do things that he shouldn't do or that he didn't understand."

¶9 Ellis also called Dr. Jon Van Doren, a neuropsychologist and applied behavior analyst who interviewed Ellis in 2024 and prepared a neuropsychological evaluation of him. Dr. Van Doren testified Ellis had poor articulation, a limited vocabulary, difficulty expressing and comprehending information, and often needed instructions repeated or rephrased because he easily gets confused. He further testified Ellis struggled on several neuropsychological tests, exhibited concrete rather than abstract thinking, never showed the ability to function as an independent adult, and relied on family support. Based on this evaluation, Dr. Van Doren opined that Ellis exhibited naivete, gullibility, and susceptibility to manipulation. Dr. Van Doren further testified that Ellis' desire for normal relationships and acceptance by others made him particularly vulnerable to manipulation.

### D. The State and Ellis Dispute Whether Ellis Opened the Door to Rebuttal Evidence of His Prior Acts.

¶10 After Ellis rested, the State asked the court to clarify its Rule 404(b) ruling. The State acknowledged the November 2024 written order made Ellis' prior conviction inadmissible unless he testified. However, the

State argued, the court's January 2025 elaboration of its ruling distinguished between Ellis' conviction and the underlying acts and allowed the prior acts' admission if the defense "put[] these three characteristics at issue." The State argued Ellis "put his ability to do this crime at issue" and therefore "open[ed] the door to" rebuttal evidence demonstrating he was capable of the conduct alleged, including evidence he could communicate by text message and recruit individuals for prostitution. The State also argued the defense's presentation was "very borderline on diminished capacity anyhow" because the defense was using Ellis' communication difficulties, gullibility, naivete, and susceptibility to manipulation to argue that he "does not have the actus reus to commit th[e] crime." Finally, the State emphasized it sought to introduce only the underlying acts and would not "discuss any arrests, court proceedings, [or] conviction" unless Ellis changed his mind about testifying.

¶11 Ellis rejected the State's interpretation of the court's rulings, arguing his prior acts were inadmissible. He argued the court limited admission of the prior-act evidence to circumstances in which Ellis testified or raised a diminished-capacity defense, and that he had done neither. Ellis maintained he merely presented admissible "behavioral-tendency evidence" or "observation evidence" about his limitations and had presented no diminished-capacity defense.

¶12 The court rejected Ellis' arguments. The court observed the defense had "made much of the fact that Mr. Ellis has very poor communication abilities, that he is gullible and easily manipulated and naive." The court further explained that it did not read the earlier rulings of the prior judge in the case to condition admission of the evidence on the presentation of a diminished-capacity defense because "[d]iminished capacity isn't allowed in Arizona," so "that wouldn't make sense." While "recogniz[ing] that the evidence is very prejudicial," the court concluded it was "more probative than prejudicial." The court found the evidence admissible under Rule 404(b) as showing "motive, opportunity, intent, preparation, plan, knowledge, [and] absence of mistake or accident."

¶13 Defense counsel objected that the ruling penalized Ellis for exercising his right not to testify because "[o]ne of the big reasons he decided not to testify [was] because he didn't want any evidence of his prior conviction coming in," and if an undercover officer testified about their texts with Ellis, "the jury will know that there was at least an investigation, if not a prior conviction out there." The State responded that Ellis was not being punished for declining to testify because the conviction was still

excluded and only the underlying acts would be admitted because the defense "opened the door" by placing the relevant characteristics at issue.

### E. An Undercover Officer Testifies Ellis Previously Used Social Media and Text Messages to Recruit Her Into Prostitution and to Discuss Dividing the Proceeds 50/50.

¶14 The State then called a PPD Sergeant, who testified that while working undercover in PPD's vice unit in 2014, she created a social media profile and was contacted by a man identifying himself as "Phoenix Locc Cuhz." The Sergeant testified the person later identified himself as "Pheen" and communicated at first through social media messages, and later, texts.

¶15 The Sergeant identified an exhibit containing her messages with the man, which included discussions about forming a "team," "choosing up," loyalty, and splitting earnings "50/50." The Sergeant testified that based on her training and experience investigating prostitution, "choosing up" meant declaring loyalty and agreeing to work for a pimp, and that the communications were the man's effort to recruit her into prostitution under his direction. She further testified that after the undercover operation concluded, investigators interviewed Ellis and confirmed that the phone number from which the messages were sent belonged to him, and that he was "Pheen." The court admitted the messages into evidence over Ellis' Rule 404(b) objection.

### F. The Jury Convicts Ellis of Child Sex Trafficking.

¶16 The jury found Ellis guilty of eight counts of child sex trafficking and acquitted him of one count alleging transportation for purposes of child sex trafficking. The jury also found the aggravating circumstance of emotional harm to the victim for seven of the eight counts. The superior court sentenced Ellis to 22 years of imprisonment on each count, and ordered the sentences to run consecutively, for a total of 176 years. Ellis timely appealed. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. § 12-120.21(A)(1); A.R.S. § 13-4031, -4033(A).

### DISCUSSION

**The Superior Court Properly Admitted the Evidence of Ellis' Prior Acts Under Rule 404(b) for a Purpose Other Than Showing His Propensity to Commit the Charged Offenses.**

¶17 Ellis argues the court abused its discretion by admitting the evidence of his prior acts relating to his 2014 charge for attempted

pandering. He contends the evidence was inadmissible propensity evidence and that the court's November 2024 order precluded its admission unless he testified. Ellis further argues that, relying on that ruling, he elected not to testify. The State argues that, by presenting evidence of his difficulty communicating, gullibility, naivete, susceptibility to manipulation, and inability to function independently, Ellis placed his ability to engage in the charged conduct directly at issue. This, the State contends, opened the door to rebuttal evidence showing he could communicate through texts, understood prostitution-related terminology, and knew how to recruit people into prostitution. The State also argues the challenged evidence was not offered to establish propensity, but instead to rebut Ellis' claim that he lacked the ability, knowledge, and sophistication needed to commit the charged offenses. We agree with the State.

¶18        Ellis properly objected at trial, so we "review the superior court's decision to admit [the] other-acts evidence for an abuse of discretion." *State v. L&L Invests. LLC*, --- Ariz. ---, --- ¶ 41, 587 P.3d 615, 625 (App. 2026). Although Rule 404(b) prohibits the admission of other-act evidence to prove a defendant's criminal propensity, such evidence may be admitted for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b)(2).

¶19        Ellis focuses exclusively on the November 2024 order's statement that the State could introduce the evidence of his prior text messages if he testified. But the order said more. The same ruling barred the State from eliciting testimony concerning Ellis' prior acts during its "case-in-chief only." But the challenged evidence was not admitted during the State's case-in-chief. Rather, it was admitted in rebuttal after Ellis presented evidence of his communication difficulties, gullibility, naivete, and susceptibility to manipulation. Moreover, in later pretrial proceedings, the court permitted Ellis to present observational evidence of his communication abilities and behavioral characteristics, which included gullibility, naivete, and susceptibility to manipulation, while recognizing that the State could rebut evidence suggesting Ellis lacked the ability to use a cell phone, send text messages, exchange money, or engage in conduct related to the charged offenses. As the State notes, the court said the "State absolutely can rebut that they think he can use a cell phone and knows how to text and read and write . . . if the defense opened the door to all of those things." Thus, admissibility did not turn solely on whether Ellis testified.

¶20        Ellis then presented precisely the type of evidence that opened the door to the rebuttal of which he complains. Through Aunt Fay

and Dr. Van Doren, Ellis presented evidence he had significant communication difficulties (including difficulty texting coherently), was gullible and naive, easily manipulated, and lacked the sophistication needed to engage in the conduct the State alleged. Ellis' defense was not merely that he did not commit the charged offenses. Rather, he argued his limitations rendered him incapable of engaging in the charged conduct and that the victim manipulated him. Once Ellis advanced that theory, evidence tending to show that he could communicate through text messages, understood prostitution-related terminology, and was capable of recruiting another person into prostitution became relevant to rebut those claims.

¶21    The challenged evidence was thus not admitted to establish that Ellis acted in conformity with a criminal disposition or had a propensity to engage in prostitution-related offenses. Rather, it was admitted to rebut the limitations and characteristics Ellis placed before the jury. Because the State offered the evidence to rebut those claims, its relevance did not depend on an inference that Ellis acted in conformity with a criminal character, as prohibited by Rule 404(b).

¶22    Ellis argues that because he denied committing the charged offenses, the State could not introduce prior-act evidence to prove intent, knowledge, or plan, relying on *State v. Ives*, 187 Ariz. 102 (1996), *State v. Torres*, 162 Ariz. 70 (App. 1989), *State v. Hughes*, 189 Ariz. 62 (1997), and *State v. Vigil*, 195 Ariz. 189 (App. 1999). But those cases are distinguishable. In each, the defendant's prior conduct only fairly suggested propensity. But unlike the defendants in *Ives*, *Torres*, *Hughes*, and *Vigil*, Ellis placed his ability to engage in the charged conduct at issue by arguing that his communication difficulties, gullibility, naivete, and susceptibility to manipulation rendered him incapable of committing the offenses. Once he did so, the State was entitled to rebut those claims. The prior communications were also probative of Ellis' knowledge of prostitution-related terminology and practices, including recruiting individuals to work for him and discussing how earnings would be shared. The court was thus within its discretion in concluding the evidence was admissible under Rule 404(b) for purposes other than showing Ellis' propensity to commit the charged offenses, and that its probative value outweighed the danger of unfair prejudice.

**CONCLUSION**

¶23          We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:        JR